**WYOMING INSURANCE GUARANTY ASSOCIATION, Appellant (Plaintiff),**

v.

**ALLSTATE INDEMNITY COMPANY and Allstate Insurance Company, Appellees (Defendants).**

No. 91–204.

Supreme Court of Wyoming.

Dec. 21, 1992.

Rehearing Denied Feb. 3, 1993.

Paul D. Schierer of Pence and MacMillan, Laramie, for appellant.

Robert G. Wright of Richards, Brandt, Miller & Nelson, Salt Lake City, UT, for appellees.

Before MACY, C.J., and THOMAS, CARDINE, URBIGKIT * and GOLDEN, JJ.

CARDINE, Justice.

The Wyoming Insurance Guaranty Association (WIGA) was called upon to step into the shoes of Laramie Insurance Company by assuming the obligations of its automobile liability insurance policy when Laramie Insurance Company became insolvent. The vehicle involved in this accident was insured by Laramie Insurance Company. Ms. Herring was driving this non-owned vehicle with permission of the named insured. Ms. Herring was driving this non-owned vehicle with permission of the named insured. Ms. Herring was also an insured under a separate automobile liability insurance policy on an owned automobile with the appellee, Allstate Insurance Company (Allstate). WIGA sought to require Allstate to defend and indemnify in the lawsuit filed. Allstate refused. The district court entered judgment in favor of Allstate.

We affirm.

WIGA expounds this summary of the issues:

Did the trial court err in finding that Allstate Indemnity Company and Allstate Insurance Company (Allstate) was not the responsible insurer, not obligated to cover the loss in *Eigenberger v. Herring* and not required to indemnify the Wyoming Insurance Guaranty Association for sums paid in settlement and defense of that action?

* Chief Justice at time of oral argument.

Allstate restyles the issue with this query:

Did the trial court correctly rule that appellee Allstate Indemnity Company and Allstate Insurance Company ("Allstate") shoulders no obligation to indemnify the Wyoming Insurance Guaranty Association ("WIGA") for any liability, damages or expenses arising from the action entitled *Christine A. Eigenberger v. Melina Herring,* Civil No. 23150, in the Second Judicial District In and For Albany County, State of Wyoming?

The stipulated facts are:

The facts in this case are not in dispute. On or about August 31, 1989 at about 9:00 p.m., Melina Lee Herring was involved in an accident with Christine A. Eigenberger at the corner of Ninth Street and Ivinson Avenue, Laramie, Wyoming. Eigenberger was traveling north on Ninth Street on a bicycle when she entered the intersection. At the same time, Herring was traveling south on Ninth Street in an 1982 Buick Electra owned by F. Otto Bolln and Leslie Gay Bolln, residents of Douglas, Wyoming. Herring was a permissive user of the Bolln vehicle at the time of the accident. An accident occurred when Herring attempted to turn East onto Ivinson. The bicycle and vehicle collided.

Eigenberger filed a Complaint seeking $112,300.00 in damages from Herring in Civil Action No. 22844 in the District Court, Second Judicial District, County of Albany, State of Wyoming. A copy of the complaint is attached hereto as Exhibit "A" and incorporated herein by reference. Eigenberger's Complaint alleged that Herring was negligent in failing to yield the right of way to Eigenberger when Herring completed the left turn onto Ivinson, thereby causing the accident and injuries to Eigenberger. Herring filed an answer denying negligence and, alternatively, alleging comparative negligence.

At the time of the accident, the Bolln vehicle was insured by Laramie Insurance Company, Policy No. LPA 11921, with liability limits of $100,00.00 each person and $300,000.00 each accident. A copy of the insurance policy with declarations page is attached as Exhibit "B" and incorporated herein by reference. The Laramie Insurance Company was declared insolvent pursuant to Wyoming Statutes § 26–41–103(a)(iii) by a court of competent jurisdiction in Civil Action No. 22800, Second Judicial District, County of Albany, State of Wyoming on February 14, 1990. A copy of the Order Appointing Receiver and Directing Liquidation and Declaring Insolvency is attached hereto as Exhibit "C" and incorporated herein by reference. Pursuant to its statutory duty, Wyoming Statutes § 26–4–101 *et seq.,* Plaintiff Wyoming Insurance Guarantee Association (hereinafter referred to as "WIGA") agreed to defend and indemnify Herring.

During the course of said defense, Plaintiff WIGA learned that Herring was insured under Allstate Policy No. 017–171–172, 10/25, FC9–645479 issued to John and Janet Herring with liability limits of $100,000.00 each person, $300,000.00 each occurrence. A copy of the insurance policy with declarations page is attached hereto as Exhibit "D" and incorporated herein by reference. WIGA sent notice of the suit to Allstate with a request that Allstate defend the action. Allstate declined. There is no issue regarding the adequacy or timeliness of the notice. WIGA first made its demand for $14,912.48 by letter dated September 10, 1990. A copy of said letter is attached hereto as Exhibit "E" and incorporated herein by reference.

Civil Action No. 22844 was settled prior to trial with a payment of $10,000.00 by WIGA to Eigenberger. A copy of the Release of All Claims and Order of Dismissal are attached hereto as Exhibits "F" and "G" respectively and incorporated herein by reference. WIGA incurred $4,912.48 as costs of defense. The settlement amount and attorney's fees paid to Pence and MacMillan by WIGA in defense of Civil Action No 22844 are reasonable. The sole issue to be determined is whether WIGA or Allstate was required to defend and pay the loss in Civil

Action No. 22844. If Allstate was required to defend and pay, Judgment in the amount of $14,912.48 plus seven percent (7%) prejudgment interest from September 10, 1990 should be entered against Allstate. If WIGA was required to defend and pay, Plaintiff's Complaint should be dismissed.

WIGA was created to assure that a policy holder would be protected in the event of the insolvency of an insurer. W.S. 26–31–101, –117 (1983); 19A John A. Appleman, Insurance Law and Practice § 10801 (1982); 2A Ronald A. Anderson, Couch on Insurance 2d § 22:27 (Rev. ed. 1984). Operating funds are generated by member assessments. W.S. 26–31–107 (1983). The duties and powers of WIGA are set out in W.S. 26–31–106 (1983):

(a) The association shall:

(i) Be obligated to the extent of the covered claims existing prior to the determination of insolvency and arising within thirty (30) days after the determination of insolvency, or before the policy expiration date if less than thirty (30) days after the determination, or before the insured replaced the policy or causes its cancellation, if he does so within thirty (30) days of the determination, but the obligation includes only that amount of each covered claim which exceeds one hundred dollars ($100.00) and is less than one hundred thousand dollars ($100,-000.00), except that the association:

(A) Shall pay the full amount of any covered claim arising out of a worker's compensation policy; and

(B) Is not obligated to a policyholder or claimant in an amount exceeding the insolvent insurer's obligation under the policy from which the claim arises.

(ii) *Be deemed the insurer to the extent of its obligation of the covered claims and to that extent has all rights, duties and obligations of the insolvent insurer as if the insurer were not insolvent;*

(iii) As provided in W.S. 26–31–107 assess insurers' amounts necessary to pay the association's obligations under paragraph (i) of this subsection, subsequent to an insolvency, the expenses of handling covered claims subsequent to an insolvency, the cost of examinations under W.S. 26–31–112 and any other expenses authorized by this chapter;

(iv) Investigate claims brought against the association and adjust, compromise, settle and pay covered claims to the extent of the association's obligation and deny all other claims;

(v) Notify any persons as the commissioner directs under W.S. 26–31–109(a)(iii);

(vi) Handle claims through its employees or through one (1) or more insurers or other persons designated as servicing facilities, whose voluntary accepted designation is subject to the commissioner's approval;

(vii) Reimburse each servicing facility for association obligations it pays and for expenses incurred while handling association claims; and

(viii) Pay any other association expenses authorized by this chapter.

(b) The association may:

(i) Appear in, defend and appeal any action on a covered claim or on a claim brought against the association;

(ii) Employ or retain any persons necessary to handle claims and perform other association duties;

(iii) Borrow funds necessary to effect the purposes of this chapter in accord with the plan of operation;

(iv) Sue or be sued;

(v) Negotiate and become a party to contracts necessary to carry out the purpose of this chapter;

(vi) Review settlements, releases and adjustments to which the insolvent insurer or its insureds were parties to determine the extent to which the settlements, releases and judgments may be properly contested;

(vii) Refund to the member insurers in proportion to the contribution of each member insurer, that amount by which the association's assets exceed its liabilities as the board of directors determines;

(viii) Perform any other acts necessary to carry out the purpose of this chapter. [emphasis added]

Another provision of the act is also essential to resolution of the issues posed for our consideration, W.S. 26–31–111 (1983):

(a) Any person *having a claim against an insurance policy* other than a policy of an insolvent insurer which is also a covered claim, shall first exhaust his right under the policy. Any amount payable on a covered claim under this chapter shall be reduced by the amount of any recovery under the insurance policy. [emphasis added]

No person has a claim against the Allstate policy until the Laramie Insurance Company limits are first exhausted. The Allstate policy specifically provides that its insurance "with respect to a temporary substitute automobile or a non-owned automobile shall be excess insurance over any other collectible insurance." (*See* p. 468, *infra.*) The existence of WIGA makes the Laramie Insurance co-policy collectible. Since this claim settled for less than the Laramie Insurance policy limits, there was never an obligation upon Allstate to defend or pay.

Because WIGA relies almost exclusively upon cases which are concerned with uninsured motorist coverage, we also consider here Wyoming's statutes which treat the subject of uninsured motor vehicle insurance coverage. W.S. 31–10–101, –104 (1989). W.S. 31–10–102 provides:

For purpose of coverage under W.S. 31–10–101, the term "uninsured motor vehicle," subject to the terms and conditions of the coverage, includes an insured motor vehicle where the liability insurer thereof is unable to make payment with respect to the legal liability of its insured within the limits specified therein because of insolvency.

Wyoming Insurance Regulations, ch. XXIII, § 4 (1989), provides:

Section 4. **"Other" Insurance Clauses.** In all instances where the insured holds more than one policy of uninsured motorists insurance or is entitled to recover under more than one policy of uninsured motorists insurance, for which separate premiums have been paid, the extent of this coverage will be the combined coverages under all policies, and actual damages sustained by the insured will be recoverable to the full extent of the combined limits of all such policies. Such recovery, however, will not exceed the minimum requirements for coverage[1] under Section 31–9–102—W.S. 1977, as to all other policies except the primary policy. The primary policy shall be construed to mean that policy which provides the coverage for the insured automobile involved in the accident.

The parties agree that the claim at issue is a covered claim as defined in W.S. 26–31–103(a)(ii) (1983) and that WIGA had a general duty to pay the claim because the claim existed prior to the determination of insolvency. W.S. 26–31–106(a)(i). However, WIGA and Allstate disagree as to whether Allstate was required to defend and indemnify under the circumstances of this case.

Allstate contends its policy would have been written differently if it had intended its policy to apply in an instance such as this and that the uninsured motor vehicle statutes, rules and regulations, and case law do not apply in this circumstance. We agree. The policy included these provisions:

Part 1:

Allstate will pay for an insured all damages which the insured shall be legally obligated to pay because of:

1. bodily injury sustained by any person, and

___

1. W.S. 31–9–102(a)(xi) provides:
   (xi) "Proof of financial responsibility" means evidence of ability to respond in damages for liability, resulting from accidents occurring subsequent to the effective date of the proof, arising out of the ownership, maintenance or use of a motor vehicle, in the amount of twenty-five thousand dollars ($25,000.00) because of bodily injury to or death of

one (1) person in any one (1) accident, and subject to the limit for one (1) person, in the amount of fifty thousand dollars ($50,000.00) because of bodily injury to or death of two (2) or more persons in any one (1) accident, and in the amount of twenty thousand dollars ($20,000.00) because of injury to or destruction of property of others in any one (1) accident[.]

2. injury to or destruction of property,

arising out of the ownership, maintenance or use, including loading and unloading, of the owned automobile or a non-owned·automobile.

\* \* \* \* \* \*

*If there is other insurance*

Allstate shall not be liable under this Part 1 for a greater proportion of any loss that the applicable limit of liability stated in the declarations bears to the total applicable limit of liability of all collectible insurance against such loss; provided, however, the insurance with respect to a temporary substitute automobile or a non-owned automobile shall be excess insurance over any other collectible insurance.

Part 2:

4. *Non-duplication of Benefits; Other Insurance.* No eligible injured person shall recover duplicate benefits for the same elements of loss under this or any similar insurance. In the event the eligible injured person has other similar insurance available and applicable to the accident, the maximum recovery under all such insurance shall not exceed the amount which would have been payable under the provisions of the insurance providing the highest dollar limit, and Allstate shall not be liable for a greater proportion of any loss to which this coverage applies than the limit of liability hereunder bears to the sum of the applicable limits of liability of this coverage and such other insurance.

The Allstate policy included "Uninsured Motorist Insurance." That section of the policy included:

3. *"uninsured automobile"* means:

(a) a motor vehicle with respect to the ownership, maintenance or use of which there is, in at least the amounts specified by the financial responsibility law of the state in which the insured automobile is principally garaged, no bodily injury liability bond or insurance policy applicable at the time of the accident with respect to any person or organization legally responsible for the use of such automobile, or with respect to which there is a bodily injury liability bond or insurance policy applicable at the time of the accident but the company writing the same either has denied coverage thereunder or is or becomes insolvent[.]

Section 26–31–106(a)(ii) provides that WIGA was deemed to be the insurer of the insured once Laramie Insurance Company became insolvent. The uninsured motor vehicle statutes, supplementing rules and regulations, and case law cited by WIGA would operate to repeal or override W.S. 26–31–106(a)(ii) if we were to give them the effect contended for by WIGA. The quoted provisions of the Allstate policy which provide coverage when the insured is driving a non-owned automobile apply only where there is no other collectible insurance. We hold that under the factual circumstance presented here W.S. 26–31–106(a)(ii) furnishes a source of collectible insurance.

Affirmed.

URBIGKIT, J., files a dissenting opinion in which THOMAS, J., joins.

THOMAS, J., files a separate dissenting opinion.

URBIGKIT, Justice, dissenting, with which THOMAS, Justice, joins.

I respectfully dissent.

The problem I have with the majority opinion is that it employs a selective application of statutory language in total disregard of the Wyoming State Legislature's intended purpose when it adopted the Wyoming Insurance Guaranty Association Act in 1971. Because it summarily concludes that the Wyoming Insurance Guaranty Association (WIGA) "step[ped] into the shoes" of the Laramie Insurance Company pursuant to Wyo.Stat. § 26–31–106(a)(ii) (1983), the majority derogates Wyo.Stat. § 26–31–111(a) (1983) while at the same time ignoring an extensive body of related case law and the underlying policy considerations which support a different result. Those statutory provisions state in part:

(a) The association shall:

\* \* \* \* \* \*

(ii) Be deemed the insurer to the extent of its obligation of the covered claims and to that extent has all rights, duties and obligations of the insolvent insurer as if the insurer were not insolvent[.]

Wyo.Stat. § 26–31–106(a)(ii).

(a) Any person having a claim against an insurer under an insurance policy \* \* \* shall first exhaust his right under the policy. Any amount payable on a covered claim under this chapter shall be reduced by the amount of any recovery under the insurance policy.

Wyo.Stat. § 26–31–111(a).

To fully appreciate the path taken by the majority, a brief synopsis and critique of the majority opinion is in order. Following recitation of the appellate issues, stipulated facts, and statements concerning WIGA's purpose and source of operating funds, the majority quotes Wyo.Stat. § 26–31–106 (outlining WIGA's duties and powers) and the "exhaustion" provision in Wyo.Stat. § 26–31–111(a) ("Any person having a claim against an insurance policy \* \* \*

shall first exhaust his right under the policy.").

Next, the majority summarizes the dispositive basis for its decision—since this case involved a borrowed automobile—the Allstate Insurance Company (Allstate) policy only provides excess coverage "over any other collectible insurance." Further, the existence of WIGA makes the insolvent Laramie Insurance Company's policy "collectible" and Allstate thus had no obligation to defend or pay. In effect, the majority adopts Allstate's appellate argument *in toto* and without relying on any authority other than a literal application of Wyo.Stat. § 26–31–106(a)(ii) and the "other insurance" clause in the Allstate policy. The simple issue presented in this appeal is whether "drive other car" (DOC) coverage,[1] in the case where the initial insurance carrier is insolvent, should be applied to a loss before the claimant's resort to the state guaranty fund is justified. The majority says "no" and I strongly disagree.

The majority dismisses WIGA's appellate argument by characterizing it as relying "almost exclusively" upon "uninsured motorist" cases.[2] Without discussion of or

---

1. For discussion of DOC and unowned vehicle policy coverage, see 6C John Alan Appleman and Jean Appleman, *Insurance Law and Practice* § 4455 (Buckley ed. 1979) and 12 Ronald A. Anderson, *Couch on Insurance* 2d § 45:239 (1981).

2. In this case, the uninsured motorist section of the Allstate policy (Section II—Protection Against Bodily Injury by Uninsured Motorists) was unavailable as a direct source of recovery for Christine A. Eigenberger since the policy only provides uninsured motorist coverage for bodily injuries sustained by the insured (Melina Lee Herring) and not for injured third persons (Eigenberger). Nonetheless, the majority quotes but does not discuss the "uninsured automobile" definition in Section II of the Allstate policy. It is noteworthy, however, that the uninsured motorist provision in the Allstate policy clearly anticipates Allstate having to provide insurance protection due to competitor insolvency (i.e., "the company writing the [insurance policy] \* \* \* is or becomes insolvent").

Further, I compare the "other insurance" condition in Section I of the Allstate policy (which states that the Allstate policy "shall be *excess insurance over any other collectible insurance*" with respect to a non-owned automobile) (emphasis added), with the "other insurance"

condition in Section II of the Allstate policy. The "other insurance" clause in Section II states:

With respect to bodily injury to an insured while occupying an automobile not owned by the named insured, the insurance under this coverage shall apply only as *excess insurance over any other similar insurance available to such insured and applicable to such automobile as primary coverage.*

(Emphasis added.)

I elaborate on this aspect of the Allstate policy for two reasons. First, I want to emphasize that Allstate seems to equate "collectible" insurance with "available" insurance. Black's Law Dictionary 135 (6th ed.1990) defines "available" as "[s]uitable; *useable; accessible; obtainable; present or ready for immediate use.* Having sufficient force or efficacy; effectual; valid." (Emphasis added.) In this case, since the Laramie Insurance Company was insolvent, its insurance certainly was not "useable; accessible; obtainable; present or ready for immediate use."

Second, if the injured person in this case had been automobile driver Herring rather than bicycle rider Eigenberger, then, without question, Allstate would have been liable for insurance coverage and would not have been able to argue that the uninsured motorist coverage in the policy and the whole body of related case law relied

reference to the accumulated body of related case law[3] and the wealth of other authority discussed by both sides in appellate briefing, the majority dismisses WIGA's argument by simply stating that the court agrees with Allstate that the uninsured motor vehicle statutes, rules, regulations and case law do not apply in this circumstance. Consequently, the majority summarily concludes that WIGA "furnishes a source of collectible insurance." By this linguistic adaptation, the majority elevates the "excess insurance over any other collectible insurance" clause in the Allstate policy in derogation of the statutory "exhaustion" provision in Wyo.Stat. § 26–31–111(a).

Although WIGA was enacted to provide a "last resort" source of insurance protection, the majority affirms that WIGA pays and Allstate does not. In this regard, the majority's statement that "WIGA was created to assure that a *policy holder* would be protected in the event of the insolvency of an insurer" is forgotten. (Emphasis added.) Allstate, a solvent insurance company paid by Herring to provide comprehensive liability insurance protection, ends up being the "protected" party as a result of this majority decision. By no stretch of the imagination does Allstate qualify as the "policy holder" that WIGA was created to protect from other-insurer insolvency. *Ross v. Canadian Indem. Ins. Co.*, 142 Cal.App.3d 396, 191 Cal.Rptr. 99, 103 (1983) (quoting *California Union Ins. Co. v. Cen-*

*tral National Ins. Co.*, 117 Cal.App.3d 729, 734, 173 Cal.Rptr. 35 (1981)) (" 'The Legislature chose to provide a limited form of protection for the public, *not a fund for the protection of other insurance companies from the insolvencies of fellow members.*' ") (Emphasis in original.) *See* 19A John Alan Appleman & Jean Appleman, *Insurance Law and Practice* § 10801 (1982).

The real question presented is whether the state fund has been structured to be the insurance resource of last resort or a substitute for the primary carrier when the primary carrier becomes insolvent. This decision should be determined by clear statutory language and not interpretive application of insurance policy exclusion or priority terminology.

There can be no argument that at the time and place of this accident, the tort feasor, Herring, was insured by, and the victim, Eigenberger, was protected by, an insurance policy that was operational and included operator coverage: DOC—unowned vehicle clause, Allstate insurance policy No. 017–171–172, FC9–645479. Actually there were three insurance resources in effect at that time as a requirement of the financial responsibility law of Utah, where the Allstate policy was written, and of the state of Wyoming where the driver was engaged in operating a motor vehicle.[4]

In describing these three coverages, it should be recognized that they are not nec-

upon by WIGA was inapplicable. I find no justification for conditioning the availability or unavailability of Allstate coverage for this type of accident solely on the basis of whether the injured party is a first or third-party claimant. Although Eigenberger would not have been able to claim coverage under the uninsured motorist portion of the Allstate policy (Section II), she clearly qualifies as someone who received bodily injury at the hands of an Allstate-insured driver permissibly operating a non-owned private passenger automobile under Part 1 of Section I of the Allstate policy—that portion of the policy governing Herring's personal liability protection. Herring and all others who purchase automobile liability insurance do so in part to protect themselves against exactly what happened here.

**3.** The case law on the subject is extended. *See* Caroll J. Miller, Annotation, *Validity, Construc-*

*tion, and Effect of Statute Establishing Compensation for Claims Not Paid Because of Insurer's Insolvency*, 30 A.L.R.4th 1110 (1984). For the associated subject, see Jane M. Draper, Annotation, *Primary Insurer's Insolvency as Affecting Excess Insurer's Liability*, 85 A.L.R.4th 729 (1991).

**4.** In many states, there would be a fourth resource which does not exist in Wyoming. It is no-fault insurance, usually designated personal injury protection benefit plan (PIP). *See McMichael v. Robertson*, 77 Md.App. 208, 549 A.2d 1157, 1158 (1988). For a clear recitation of the operative distinctions in theory and result between uninsured motorist and no fault first-party automobile insurance coverages, see *Lomax v. Nationwide Mut. Ins. Co.*, 964 F.2d 1343 (3rd Cir.1992).

essarily supplementary in amount, but are always in priority order for application. This is not primary and excess insurance as we shall subsequently discuss. This is stages or levels of insurance. The first is vehicle insurance which, by operation of financial responsibility acts, insurance codes and uniform policy provisions, is primary *if it exists and to the extent of its coverage.* (This is, of course, assuming that the state does not have PIP as first party insurance which would always apply as a first level). *See* 8C John Alan Appleman & Jean Appleman, *Insurance Law and Practice* § 5102.65, at 511 (1981). The second level is the operator's coverage, DOC, or unowned vehicle (UV) coverage, which was actually provided in this case as primary insurance to the driver by Allstate.

The third insurance resource is the first party uninsured motorist coverage, which is not involved in this case since the victim was on a bicycle rather than in a motor vehicle, or perchance under some policies, riding a motorcycle.

The fourth insurance resource is WIGA. Consequently, the issue is whether the primary operator insurance, which is secondary in application, through the operator's policy DOC or UV clause, escapes liability by an assessed earlier priority against the state fund.

Some basic facts require recognition. The subject with which this case becomes embodied is required insurance policy provisions within the Financial Responsibility Acts. The Allstate policy covering the tort feasor driver was a Utah policy. No evidence was provided in the record that Allstate used an essentially different policy for Utah than it issues in Wyoming. We do not know how long the driver had been in Wyoming, but reason suggests her status was as a college student. The regularity with which the driver may have driven the F. Otto and Leslie Gay Bolln vehicle is also undisclosed. In any event, the Utah policy complies with both the Wyoming Financial Responsibility Act, Wyo.Stat. § 31–9–405 (1989) (in particular subsection (c)—operator's policy provision) and, although phrased differently, with the Utah provision, Utah Code Ann. §§ 41–12(a)–402 and 31A–22–303 (1988) (in particular § 31A–22–303(b)(ii), which establishes the same criteria).

The Allstate policy provided a broad unowned operator coverage, "coverage AA—arising out of the * * * use of a non owned vehicle" which included a relative as an insured. By definition, Herring clearly complied. Her status as an insured under the policy to require defense and indemnity in the action is not at issue. Controversy was confined to the claim that the state fund, in replacement of the insolvent carrier on the motor vehicle, had to provide liability coverage first. Allstate argues that since a first level solvent carrier did not exist, the state fund should appear in replacement as the insurance written on the vehicle while the state fund sought escape in the required exhaustion of other insurance criteria of the statutory provisions in Wyo.Stat. § 26–31–111(a).

The interesting facet of this litigation is the multitude of uninsured motorist cases (UM), and the dearth of DOC or UV clause cases.[5]

A multitude of UM cases teach us, with the apparent exception of the state of Loui-

---

5. Some fringe or partly related concept cases can be found, but none of any direct relevant substance involving a DOC clause in either Wyoming or Utah. In fact, only one case has been unearthed which addresses this specific subject of the relationship between DOC–UV clause coverage after insolvency of the automobile insuring carrier and the state fund responsibility. I have considered the one relevant case carefully, although not cited in majority opinion. It is not logically or precedentially sound and clearly does not comply with Wyoming statutory language in required exhaustion of available insurance or the broad based UM cases although Pennsylvania insolvency fund law seems to be within the majority trend. *See Donegal Mut. Ins. Co. v. Long,* 387 Pa.Super. 574, 564 A.2d 937 (1989), *aff'd* 597 A.2d 1124 (1991). Although that case was one of the two principal sources of argument by Allstate, its nonuse by the majority confirms my view of its logical inapplicability to this Wyoming statutory interpretation decision.

siana,[6] *Hickerson v. Protective Nat. Ins. Co. of Omaha*, 383 So.2d 377 (La.1980), that UM coverage benefits are first applied before guaranty fund exposure develops. The Kansas court in *Hetzel v. Clarkin*, 244 Kan. 698, 772 P.2d 800, 804 (1989) stated: "Louisiana appears to be the only reported jurisdiction which has not allowed the state guaranty insurance association credit for sums recovered from the plaintiff's own insurance [uninsured motorists coverage]." The court then recognized that: "The Louisiana Supreme Court's analysis in *Hickerson*, that uninsured motorist coverage was not contemplated in the 'nonduplication' provision of its Guaranty Act, is not applicable to Kansas." *Hetzel*, 772 P.2d at 804. Other cases cited therein, or otherwise sustaining the same view, include *King v. Jordan*, 601 P.2d 273 (Alaska 1979); *Witkowski v. Brown*, 576 A.2d 669 (Del.Super.1989); *Spearman v. State Sec. Ins. Co.*, 57 Ill.App.3d 393, 14 Ill.Dec. 729, 372 N.E.2d 1008 (1978); *Lucas v. Illinois Ins. Guaranty Fund*, 52 Ill.App.3d 237, 10 Ill. Dec. 81, 367 N.E.2d 469 (1977); *McMichael v. Robertson*, 77 Md.App. 208, 549 A.2d 1157 (1988); *Vokey v. Massachusetts Insurers Insolvency Fund*, 381 Mass. 386, 409 N.E.2d 783 (1980); *Wondra v. American Family Ins. Group*, 432 N.W.2d 455 (Minn.App.1988), *overruled on other grounds sub nom. Garrick v. Northland Ins. Co.*, 469 N.W.2d 709 (Minn.1991); *State Farm Mut. Auto. Liability Ins. Co. v. Kiser*, 168 N.J.Super. 230, 402 A.2d 952 (1979); *Welch v. Armer*, 776 P.2d 847 (Okl. 1989); *Henninger v. Riley*, 317 Pa.Super. 570, 464 A.2d 469 (1983); *Sands v. Pennsylvania Ins. Guaranty Ass'n*, 283 Pa.Super. 217, 423 A.2d 1224 (1980); and *Virginia Property and Cas. Ins. Guar. Ass'n v. International Ins. Co.*, 238 Va. 702, 385 S.E.2d 614 (1989).

The UM cases demonstrate that application of benefits from the claimant's own carrier is required before the state fund becomes responsible. We move here to another stage: whether primary coverage on the operator of the offending vehicle should be applied before the state fund is faced with payment within the predicate exhaustion requirement provided by Wyo. Stat. § 26–31–111(a). Essentially, that question seems relatively simple under Wyo.Stat. § 26–31–111(a), as the statute being rephrased is, Herring, "[any person] having a claim against Allstate [an insurer] * * * shall first exhaust [her] right under the policy. Any amount payable on a covered claim under this chapter shall be reduced by the amount of any recovery under the insurance policy."

There is a most recent Oklahoma case involving a complex sequence of insolvencies which uses the majority rule in UM cases as compelling authority for required exhaustion. In *Welch*, 776 P.2d 847, the Oklahoma court had earlier adopted the under insured motorist majority rule. In the current case, *Oglesby v. Liberty Mut. Ins. Co.*, 832 P.2d 834 (Okl.1992), a claim against a third party's carrier on a products liability claim was the insurance policy exhaustion target of the guaranty fund. The Oklahoma court found a majority rule requiring exhaustion by citing ten cases. *Id.* at 843 n. 40. The court then held for worker's compensation offset and exhaustion purposes that the carrier for a third party products liability defendant must be first pursued before recovery from the guaranty fund was justified.

I find that approach and majority policy of exhaustion of "other available insurance" equally applicable here to the vehicle driver's own insurance policy under the existent DOC coverage. *See also* Paul G. Roberts, Note, *Insurance Company Insolvencies and Insurance Guaranty Funds: A Look at the Nonduplication of Recovery Clause*, 74 Iowa L.Rev. 927 (1989). I agree with the concept stated in *Oglesby* that this court may not read an exception into a statute not made by the legislature.

There is a triangular result which is created by this majority decision. At one cor-

6. The Louisiana exception was further distinguished in the Pennsylvania case of *Henninger v. Riley*, 317 Pa.Super. 570, 464 A.2d 469 (1983) by explanation that the Louisiana law permitted subrogation by the UM carrier against the insured of the insolvent carrier, which most state statutes, including Wyoming, would not. *See* Wyo.Stat. § 26–31–111(a).

ner point is Laramie Insurance Company with the automobile coverage and now insolvent. At the second corner is the driver coverage (DOC/UV), and at the third corner is UM first-party coverage. In determining priorities, it is a settled principle of law and policy language that if the vehicle is not insured, the driver's insurance is applied before the uninsured motorist first-party coverage will be applied. Furthermore, if UM coverage is available, it must be exhausted before the state fund assumes obligation. Since DOC coverage must be applied before UM applies, and UM exhaustion is required before the state fund accrues liability, it would consequently seem reasonable that even without UM coverage involvement, the DOC exhaustion would be required before the state fund obligation appears. In this case, since we have a bicyclist victim rather than a motor vehicle victim, sequences require a juxtaposition so that by the absence of a victim in a vehicle, the DOC coverage is claimed to change positions to then, for the first time, jump to a higher level than the second responsibility to step in after instead of before the state fund. Frankly, I find no justification for this magic movement either in logic, statute, or policy terminology. Where there is UM coverage, exposure to the DOC/UV coverage is the second level before the state fund; but, if there is no UM exposure or coverage, by this court's decision, the operator coverage can then move to last priority.

One of the major difficulties in these cases comes from Allstate's utilization of a second inapplicable principle for decision which is the application of broad insurance terminology to the constrained and specific subject of private passenger automobile insurance. Initially, this is the differentiation between separate policies which may be classified as primary and excess and provisions in the same policies which provide for levels of application of the same carrier's responsibility. The automobile insurance policy constricted within the criteria of the Financial Responsibility Acts as required driver coverage does not encompass the broad concepts of a primary policy and another umbrella coverage insurer.[7]

In the first place, DOC–UV coverage should not be conceptualized as excess insurance, it is primary insurance as a second level coverage to be applied only after the insurance on the described vehicle, if any, is exhausted. If there is no automobile coverage, the DOC–UV clause provides the primary coverage. UM, or its half brother—under insured motorist insurance (UIM)—is not conventional excess either, since it is not written on behalf of the tort feasor, it is substitute protection written for the victim in the similar sense that first person property damage insurance on your motor vehicle is not excess coverage to the property damage liability coverage hopefully provided by the tort feasor's insurance policy.

Conventional primary and excess coverage definitions in this general application for umbrella, general liability, and floater coverage are defined by 16 Ronald A.

---

7. For typical umbrella coverage, excess liability insurance where a drop down requirement versus a state guaranty fund application is presented, see *Washington Ins. Guar. Ass'n v. Guaranty Nat. Ins. Co.*, 685 F.Supp. 1160 (W.D.Wash. 1988); *Wurth v. Ideal Mut. Ins. Co.*, 34 Ohio App.3d 325, 518 N.E.2d 607 (1987); and *Lechner v. Scharrer*, 145 Wis.2d 667, 429 N.W.2d 491 (1988) (umbrella excess over a vehicular primary carrier). In these cases, statutory requirements regarding policy provisions were not at issue and the decision entirely resulted from an examination of the language of the excess insurance policy. *Luko v. Lloyd's of London*, 393 Pa.Super. 165, 573 A.2d 1139 (1990); *Lechner*, 429 N.W.2d at 492. This discussion can turn into the applied limits *policy coverage* versus *amounts reasonably recoverable* discussion.

*Vickodil v. Lexington Ins. Co.*, 412 Mass. 132, 587 N.E.2d 777 (1992); *Wurth*, 518 N.E.2d at 611. Those precepts resulting from policies defined as umbrella, general liability, floater, etc., that provide high level coverage based upon existence of a policy with primary underlying coverage, do not provide the same character of insurance relationships found with the private passenger automobile financial responsibility approved policies where the subjects are PIP coverage, if it exists, and, if not, the automobile insurance coverage, if any; the driver's coverage as third-party coverage; and then, finally, the first-party UM coverage. Use of terms generally applicable to umbrella and primary insurance concepts as primary and excess designations do not effectively fit the automobile policy relationship.

Anderson, *Couch on Insurance* 2d § 62:41, at 55–56 (Rev. ed. 1983 & Supp.1992):

> Primary insurance coverage is insurance coverage whereby, under the terms of the policy, liability attaches immediately upon the happening of the occurrence that gives rise to liability. Excess or secondary coverage is coverage whereby, under the terms of the policy, liability attaches only after a predetermined amount of primary coverage has been exhausted. A secondary insurer thus greatly reduces his risk of loss and this reduced risk is reflected in the cost of the policy. An excess or secondary policy will not come into operation in the absence of primary coverage and excess coverage clauses in liability policies can only be obtained where there is other primary coverage available. Until such time as the limits of primary insurance coverage are exhausted, secondary coverage does not provide any collectible insurance. Thus, where insured failed to procure primary coverage, excess insurers could not be held liable on policies. *Whitehead v. Fleet Towing Co.* (1982) 110 Ill App 3d 759, 66 Ill Dec 449, 442 NE2d 1362.

None of this discussion fits the automobile policy relationship where the better designation is first level, PIP, if it exists, *McMichael*, 77 Md.App. 208, 549 A.2d 1157; second level, in non-PIP states, insurance on the specific vehicle; third level, operator insurance clause DOC–UV; and fourth level, UM or UIM.

One form of explanation is to distinguish a general *excess limits policy* such as umbrella coverage from a *policy with excess clauses* which is the financial responsibility statutorily defined automobile insurance policy. That is what is involved here. *See Washington Ins. Guar. Ass'n v. Guaranty Nat. Ins. Co.*, 685 F.Supp. 1160 (W.D.Wash.1988), and its extensive discussion of 8A John Alan Appleman & Jean Appleman, *Insurance Law and Practice* § 4906, at 348 and § 4909, at 385 (1981). Both the business concept and the underlying insurance structure is entirely different between genuine excess insurance policies and the automobile policy with its three (or

four) levels of applied coverage. There is not only a classical difference in insurance protection character, but also a statutory control in the latter case for significant aspects of policy provisions. *See, e.g., Bartee v. R.T.C. Transp., Inc.*, 245 Kan. 499, 781 P.2d 1084 (1989), where the complexity of the case involved both financial responsibility statute driven policy requirements and concepts of umbrella and primary carrier coverage. *See also Allstate Ins. Co. v. Fowler*, 480 So.2d 1287 (Fla.1985), regarding Financial Responsibility Act primacy criteria.

Having summarized my overall impressions, I now focus attention on several specific aspects of the majority opinion. First, although taken in context, there are three sentences in the majority opinion (which, in effect, embody the majority's attempt at legal analysis) that appear to be unrelated and, in my opinion, are unsubstantiated by available authority:

> No person has a claim against the Allstate policy until the Laramie Insurance Company limits are first exhausted. The Allstate policy specifically provides that its insurance "with respect to a temporary substitute automobile or a non-owned automobile shall be excess insurance over any other collectible insurance." * * * The existence of WIGA makes the Laramie Insurance co-policy collectible.

I find these statements troublesome for several reasons. Initially, the statement that "[n]o person has a claim against the Allstate policy until the Laramie Insurance Company limits are first exhausted" reverses the legislative intent of Wyo.Stat. § 26–31–111(a) and essentially eliminates the "other than" language in the statute. In effect, the majority improperly combines the procedural elements in the "exhaustion" statute set forth in Wyo.Stat. § 26–31–111(a) with the unrelated proposition that a *solvent* Laramie Insurance Company would have been the primary insurer in this case and, thus, would need to be "exhausted" before other sources of insurance might become available.

Second—and of far greater significance—the majority balances the "excess insurance over any other collectible insurance" language in the Allstate policy against the legislature's underlying purpose in creating WIGA. The majority concludes that Allstate should prevail because the *insolvent* Laramie Insurance Company policy is "collectible" from WIGA. In doing so, I believe that the majority fails to recognize what this court said in *Allstate Ins. Co. v. Wyoming Ins. Dept.*, 672 P.2d 810, 816 (Wyo.1983):

> While the parties to an insurance contract have the right to embody in the policy such lawful terms as they wish * * * the insurance agreement must not conflict with pertinent statutes or public policy. *McKay v. Equitable Life Assurance Society of the United States*, Wyo. 421 P.2d 166 (1966); *Cincinnati Insurance Company v. Mallon*, 409 N.E.2d 1100 (Ind.App.1980).

Without question, Wyoming's insurance statutes supersede any contradictory insurance policy language that acts to circumvent the statutes. Just as Allstate is prohibited from using terms in its insurance contracts which conflict with public policy, this court should also refrain from construing insurance policy language so as to conflict with legislative intent. *State Farm Mut. Auto. Ins. Co. v. United Services Auto. Ass'n*, 211 Va. 133, 176 S.E.2d 327 (1970); *American Motorists Ins. Co. v. Kaplan*, 209 Va. 53, 161 S.E.2d 675 (1968).

By simply concluding that WIGA provides a "collectible" source of insurance, the majority eliminates the statutorily-imposed procedural requirement that other "covered claim" insurance be exhausted pursuant to Wyo.Stat. § 26–31–111(a). Although both sides in this case expend substantial energy and effort to discuss what is meant by "collectible insurance," the majority does not hesitate to decide without elaboration that WIGA is a source of "collectible insurance." *Compare Deisch and Marion, P.C. v. International Ins. Co.*, 771 P.2d 19, 20 (Colo.App.1989) ("Because of the insolvency of [the primary carrier], the underlying (primary) insurance coverage was not 'collectible by the insured * * *.' ") *with Wurth v. Ideal Mut. Ins. Co.*, 34 Ohio App.3d 325, 518 N.E.2d 607, 612 (1987) (" '[C]ollectible' does not refer to the actual payment of a sum of money, but instead refers to the existence of other applicable insurance coverage based on the particular occurrence in question."); *see also Wyoming Farm Bureau Mut. Ins. Co. v. American Hardware Mut. Ins. Co.*, 487 P.2d 320 (Wyo.1971).

As I consider this case, I find that the central issue resembles the "conflicting statute" argument raised by WIGA and addressed by this court in *West v. Wyoming State Treasurer*, 822 P.2d 1269 (Wyo.1991) (involving the question of whether the State Treasurer had a right of reimbursement for paid-out worker's compensation benefits following a third party wrongful death recovery by decedent's survivor beneficiaries). In *West*, this court paid homage to our well-established rules of statutory construction when two arguably conflicting statutes need to be "harmonized:"

> " 'If the language of a statute is clear and unambiguous, we must abide by the plain meaning of the statute, but where a statute is ambiguous, the court will resort to general principles of statutory construction in an attempt to ascertain legislative intent. Furthermore, it is a fundamental rule of statutory interpretation that all portions of an act must be read *in pari materia*, and every word, clause, and sentence must be construed so that no part is inoperative or superfluous.' " *Matter of Paternity of JRW*, 814 P.2d 1256, 1262–63 (Wyo.1991), quoting *Deloges v. State ex rel. Worker's Comp. Div.*, 750 P.2d 1329, 1331 (Wyo.1988) (citations omitted).

Furthermore, "[l]egislative intent should be ascertained, as nearly as possible, from the language of the statute viewed in the light of its object and purpose." *Moncrief v. Harvey*, 816 P.2d 97, 105 (Wyo.1991). *See also Allied–Signal, Inc. v. State Bd. of Equalization*, 813 P.2d 214, 219 (Wyo.1991). *Statutes relating to the same subject are read together to ascertain legislative intent. Longfel-*

*low v. State*, 803 P.2d 1383, 1387 (Wyo. 1991).

*West*, 822 P.2d at 1272 (emphasis added).

In complete disregard of our accepted rules of statutory construction, the majority in this case makes no attempt to harmonize Wyo.Stat. §§ 26–31–106(a)(ii) with 26–31–111(a). Instead, the majority redefines Wyo.Stat. § 26–31–106(a)(ii) by summarily concluding that WIGA furnished the source of collectible insurance when it "step[ped] into the shoes" of the Laramie Insurance Company. At the same time, the majority gives no consideration to whether or not Wyo.Stat. § 26–31–111(a) creates a procedural condition precedent that must be satisfied or "exhausted" before WIGA "step[s] in." A directly contrary result in a somewhat similar case can be found in *Palmer by Diacon v. Montana Ins. Guar. Ass'n*, 239 Mont. 78, 779 P.2d 61 (1989), where two funds were involved.

Since this is a case of first impression in Wyoming, consideration of how courts in other jurisdictions have construed substantively identical statutory and insurance policy provisions is helpful. For example, in *Bethea v. Forbes*, 519 Pa. 422, 548 A.2d 1215 (1988), several automobile accident victims joined in a personal injury action against the tortfeasor driver of a second car who had become uninsured because of his liability carrier's insolvency. In view of the insolvency, the plaintiffs also filed claims under the uninsured motorist provision in the non-tort-feasor driver's automobile insurance policy. In resolving *Bethea,* the Pennsylvania Supreme Court examined the nearly identical Pennsylvania versions of Wyo.Stat. §§ 26–31–106(a)(ii) and 26–31–111(a):

The insolvency of [the tort-feasor's insurance company] brought into operation the provisions of The Pennsylvania Insurance Guaranty Association Act ("Insurance Guaranty Act"), * * * of November 25, 1970, P.L. 716, *as amended,* 40 P.S. § 1701.101 *et seq.* That statute was enacted to give a measure of protection to policy holders and claimants who are faced with financial loss because of the insolvency of certain carriers of property and casualty insurance. Section 102(1) of the Act, 40 P.S. § 1701.102(1). To implement that purpose, the statute established the Pennsylvania Insurance Guaranty Association ("Association"), and charged it with the obligation of paying "covered claims" under property and casualty policies issued by insurers that become insolvent. Section 201 of the Act, 40 P.S. § 1701.201. The Association becomes a statutory insurer in place of the insolvent carrier to the extent of its obligations on covered claims. 40 P.S. § 1701.201(b)(1)(ii). [The functional equivalent of Wyo.Stat. § 26–31–106(a)(ii)] In that connection, the Association has "all rights, duties, and obligations of the insolvent insurer as if that insurer had not become insolvent." *Id.*

The Association's duty to pay claims is, of course, subject to conditions, not the least of which is the requirement set forth in section 503(a) [identical to the language in Wyo.Stat. § 26–31–111(a)] of the Act. That provision states the following:

"Non-duplication of recovery

Any person having a claim against an insurer under any provision in an insurance policy other than a policy of an insolvent insurer which is also a covered claim, *shall first be required to exhaust his right under such policy.* Any amount payable on a covered claim under this act shall be reduced by the amount of any recovery under such insurance policy."

40 P.S. § 1701.503(a) (emphasis added). In its general effect, the import of the first sentence in the above provision is clear: Even if a claim is one otherwise covered by the Insurance Guaranty Act, a person's right to obtain relief under the statute does not arise unless or until he has exhausted such rights as he has, with respect to the "covered claim," under an insurance policy other than the one issued by the insolvent. An obvious example of such a situation is where a person has been negligently injured in an automobile accident, and, being unable to obtain payment from the insolvent insurer of the tortfeasor, may look to the

uninsured motorist provision in his own insurance policy or in some other applicable policy.

*Bethea,* 548 A.2d at 1216 (emphasis in original).

Justice Zappala, writing in concurrence with the *Bethea* majority opinion quoted above, gave additional thought to legislative intent:

> Intending the Association to be a stopgap measure, the legislature provided that a claimant who could seek recovery under a policy other than that of the insolvent insurer must first exhaust his right under such policy. 40 P.S. § 1701.-503(a). This provision reflects the legislature's intent that fiscally solvent insurers, which are contractually obligated to pay a claim, be the primary source of payment.
>
> The Association's resources were not intended to be used unless the coverage provided by the solvent insurers was: (1) less than that provided by the insolvent insurer, and (2) inadequate to cover the damages sustained by the claimant. ***The legislative scheme provided that the Association would be the last resort for payment of a claim.***

*Bethea,* 548 A.2d at 1218 (emphasis added). *See Hetzel,* 244 Kan. 698, 772 P.2d 800 and 2A Ronald A. Anderson, *Couch on Insurance* 2d § 22:27, at 599 (Rev. ed. 1984).

An earlier California case, *Ross,* 142 Cal. App.3d 396, 191 Cal.Rptr. 99, involved an insolvent primary carrier and a solvent excess carrier. In reviewing the public policy considerations involved in the creation of the California Insurance Guaranty Association, the California court concluded:

> In our view, CIGA [California Insurance Guaranty Association] was created for the protection of the public. Thus, when a secondary insurer is available in the event of an insolvent primary insurer, the secondary insurer should be responsible in the absence of specific language to the contrary. The secondary insurer has received a premium for the risk, and thus the secondary insurer, and not CIGA, should be responsible for the coverage of the loss.

*Id.* 191 Cal.Rptr. at 104. *See also Palmer by Diacon,* 779 P.2d at 64.

Recognizing the statutory context of existing Wyoming law and reflecting on *Bethea* and *Ross* as I read the Allstate policy in this case, I fail to find "specific language" in the Allstate policy which would serve to absolve Allstate from defending and paying the Eigenberger claim. With the restructured priorities of obligation, we change the state fund from an instrumentality to protect the public, 19A Appleman, *supra,* § 10801 at 367, into a fund to underwrite solvent carriers from natural business risks of insolvency of other carriers. The covered claimants should not be other carriers with established liability. *Palmer by Diacon,* 239 Mont. 78, 779 P.2d 61.

This court prioritizes two statutes to determine state fund sequential obligation. In simplest terms, if Wyo.Stat. § 26–31–106(a)(ii) is applied first (as it is by this majority), then the initial requirement of "exhaustion" is conveniently eliminated.[8] WIGA was established as a "source of last resort"—and, by definition, there can be nothing left to "exhaust" (other than WIGA's finite resources) once you arrive at the "last resort." Herring, by majority decision, does not first exhaust her rights against her carrier, Allstate. Wyo.Stat. § 26–31–111(a). Thus, when WIGA is deemed a source of "collectible insurance" by a literal application of Wyo.Stat. § 26–31–106(a)(ii), the majority operates "to repeal or override" Wyo.Stat. § 26–31–111(a). Contrary to our well-established rules of statutory construction, this majority opin-

---

8. It is interesting to note that Section 12 of the Property and Liability Insurance Guaranty Association Model Act drafted by the National Association of Insurance Commissioners was entitled "Non–Duplication of Recovery." Although substantively identical to the equivalent statutory provision in Wyoming's version of the Model Act, in 1983 and again in 1990, the legislature saw fit to amend the title of Wyo.Stat. § 26–31–111 to reflect the explicit exhaustion requirement in Wyo.Stat. § 26–31–111(a). The title now reads: "Exhaustion of remedies under policy; claims recoverable from more than one association; claim limitation." *See* 1983 House Bills—Part 2—H.B. 111 at 904 and 1990 Wyo. Sess.Laws ch. 96.

ion does not read *all* of the related statutes in order "to ascertain legislative intent." *Longfellow v. State*, 803 P.2d 1383, 1387 (Wyo.1991); *see also West*, 822 P.2d at 1272. On the other hand, it is possible to harmonize *all* of the statutory language and satisfy the legislative intent behind the Wyoming Insurance Guaranty Association Act if the procedural "exhaustion" requirement in Wyo.Stat. § 26–31–111(a) is first applied. *King*, 601 P.2d 273. *See also* Caroll J. Miller, Annotation, *Validity, Construction, and Effect of Statute Establishing Compensation for Claims Not Paid Because of Insurer's Insolvency*, 30 A.L.R.4th 1110, 1139 (1984) and cases cited therein regarding first use of other insurance vehicle policy coverage.

Because I would find that WIGA does not provide a source of "collectible insurance" under the express provisions in Section I of the Allstate policy and within the persuasive framework of existing statutory and case law, we should hold that the Allstate policy, which provided insurance for the liability protection of the injured bicyclist, should first be exhausted before resort to the state fund would be proper.

I would reverse.

THOMAS, Justice, dissenting.

I, too, would reverse the decision of the trial court in this case, and I agree with the dissenting opinion of Justice Urbigkit, in which I join. I am satisfied the case really is controlled by Wyo.Stat. § 26–31–111(a) (1991), and the major fallacy in the majority opinion is the conclusion that there is no claim against Allstate Insurance Company because of the adoption of the Wyoming Insurance Guaranty Association Act (WIGA). Wyo.Stat. §§ 26–31–101 to –117 (1991). The effect of the majority decision is to inject the provisions of the Allstate policy as a gloss upon the statute, rather than reading the statute as controlling the provisions of the insurance policy.

This result is precisely the inverse of our usual rule.

The U.C.C. became a part of the contract as though written into its terms. *Tri-County Electric Association v. City of*

*Gillette*, Wyo.1978, 584 P.2d 995; *Application of Hagood*, Wyo.1960, 356 P.2d 135.

*Meuse–Rhine–Ijssel Cattle Breeders of Canada, Ltd. v. Y–Tex Corporation*, 590 P.2d 1306, 1309 (Wyo.1979).

We have recognized that statutory provisions become a part of the bargain contemplated by the parties in Wyoming as though the statute actually were included in the terms. *Meuse–Rhine–Ijssel Cattle Breeders of Canada Ltd. v. Y–Tex Corporation*, 590 P.2d 1306 (Wyo.1979); *Tri–County Electric Association, Inc. v. City of Gillette*, 584 P.2d 995 (Wyo.1978).

*Century Ready–Mix Company v. Lower & Company*, 770 P.2d 692, 696 (Wyo.1989).

Contractual provisions cannot rise above constitutional and statutory law.

*Tri–County Electric Association, Inc. v. City of Gillette*, 584 P.2d 995, 1004 (Wyo.1978).

It is well settled that laws which subsist at the time and place of making of a contract, and where it is to be performed, enter into and become a part of it as though expressly referred to and incorporated in its terms. (Citations omitted.)

*Application of Hagood*, 356 P.2d 135, 138 (Wyo.1960).

For me, the correct analysis is to assume that the Wyoming Insurance Guaranty Association Act is not available when analyzing the rights of the claimants and the insureds under the insurance policies. It is clear that, in the absence of WIGA, there would be a claim under the Allstate policy because of the insolvency of Laramie Insurance Company. WIGA does not expunge the insolvency of Laramie Insurance Company, but it does provide for certain results after the rights of the parties have been determined without reference to WIGA. That is exactly what Wyo.Stat. § 26–31–111(a) contemplates when it says:

(a) Any person having a claim against an insurer under an insurance policy other than a policy of an insolvent insurer which is also a covered claim, shall first exhaust his right under the policy. Any

amount payable on a covered claim under this chapter shall be reduced by the amount of any recovery under the insurance policy.

The statutory provision makes sense only if it is read to provide for exhaustion of the Allstate policy rights prior to turning to WIGA. This interpretation is buttressed by referring to the definition of a "covered claim" found in Wyo.Stat. § 26–31–103(a)(ii):

> (ii) "Covered claim" means an unpaid claim which arises out of and is within the coverage and does not exceed the applicable limits of an insurance policy to which this chapter applies issued by an insurer, if the insurer is an insolvent insurer and the claimant or insured is a resident of this state at the time of the insured event or the property from which the claim arises is permanently located in this state, but "covered claim" does not include:
>
> (A) Any amount due any reinsurer, insurer, insurance pool or underwriting association as subrogation recoveries or otherwise; * * *.

If the appropriate language is paraphrased to apply to this case the proposition is:

> Christine A. Eigenberber having a claim against Allstate Insurance Company under an insurance policy other than a policy of Laramie Insurance Company which is also a covered claim, shall first exhaust her right under the Allstate Insurance Company policy. Any amount payable on a covered claim under this chapter shall be reduced by the amount of any recovery under the Allstate Insurance Company policy.

I am satisfied that to permit the policy language to control the application of the statute is fallacious both as a matter of correct law and as a matter of policy. I would reverse the judgment of the trial court.