Jeffrey A. Christianson, Seattle, Wash., for plaintiff.

Bradford M. Gierke, Tacoma, Wash., for defendant.

**WASHINGTON INSURANCE GUARAN- TY ASSOCIATION, Plaintiff,**

v.

**GUARANTY NATIONAL INSURANCE COMPANY, a foreign insurer, Defendant.**

**No. C86–1892M.**

United States District Court, W.D. Washington, at Seattle.

May 11, 1988.

**ORDER GRANTING GNIC'S MOTION FOR SUMMARY JUDGMENT OF DISMISSAL AND DENYING PLAIN- TIFF'S MOTION FOR SUMMARY JUDGMENT**

McGOVERN, District Judge.

*Introduction*

This matter presents the question of who is responsible for the costs of defending an insured whose primary insurer has gone bankrupt; is the state guaranty association or the umbrella insurer responsible in place of the primary insurer? The issue is presented on cross-motions for summary judgment and stipulated facts.

Plaintiff Washington Insurance Guaranty Association (WIGA) is a statutory creation composed of member insurers whose purpose is

> to provide a mechanism for the payment of covered claims under certain insurance policies to avoid excessive delay in payment and to avoid financial loss to claimants or policyholders because of the insolvency of an insurer, to assist in the detection and prevention of insurer insolvencies, and to provide an association to assess the cost of such protection among insurers.

RCW 48.32.010.

Defendant Guaranty National Insurance Company (GNIC) provided an Umbrella Liability Policy for the insured. The insured's primary insurer, Early American Insurance Company, became insolvent and

---

by court order issued a notice to policyholders that it was withdrawing from the defense of policyholders in all cases.

Plaintiff WIGA stepped in and defended Sicilia Trucking, the insured, in place of the insolvent insurer. Plaintiff WIGA seeks reimbursement from the Defendant GNIC for all sums expended in the defense and settlement of the claims against Sicilia Trucking. WIGA seeks partial summary judgment declaring that the policy language of the GNIC policy imposed a duty to defend Sicilia Trucking and provided for coverage of the above claims, and that consequently GNIC must indemnify WIGA up to GNIC's policy limits.

GNIC contends that neither the language of its umbrella policy nor the WIGA Act require it to provide primary coverage up to its policy limits because of the insolvency of the primary insurance carrier. GNIC also contends that neither is it required to provide a defense in excess of the WIGA statutory limits of $300,000. (The $200,000 difference between the insolvent primary carrier's coverage of $500,000 and the $300,000 limits of WIGA coverage.)

While the Umbrella Liability Policy of GNIC should be read as a whole, there are certain provisions that are of particular importance in construing the meaning of the contract:

## II. DEFENSE AND SUPPLEMENTARY PAYMENTS

With respect to such insurance as is afforded by this policy, if there is no underlying insurer obligated to do so, GNIC shall have the right and duty to defend any suit against the insured seeking damages on account of personal injury, property damage or advertising liability....

## V. LIMITS OF LIABILITY

... GNIC shall only be liable for the ultimate net loss in excess of the

(a) applicable limits of underlying insurance as stated in Item 5 of the

Declarations, and any other underlying insurance collectible by the insured.

### Arguments of the Parties

Plaintiff WIGA argues that the phrase from the limits of liability section (1) "collectible by the insured" modifies both "underlying insurance" referring to the insurance "scheduled" in Item 5 of the Declarations and "other underlying insurance" referring to other insurance insured may have obtained but which is not "scheduled."

Thus, if the policy language is construed to mean that scheduled underlying insurance must be "collectible by the insured," and owing to insolvency, the Early American insurance was no longer "collectible by the insured," the GNIC policy would "drop down" into the place of the insolvent insurer and the floor of the GNIC policy would not be $500,000 but zero.

WIGA also argues that the policy language of Part II clearly requires GNIC to defend an insured when there is no underlying insurer obligated to do so.

WIGA argues that even if the language does not clearly impose a duty to GNIC, then it is ambiguous and must be construed in favor of the insured.

WIGA argues that the provision under Nonduplication of Recovery of RCW 48.32.-100 requires exhaustion of other insurance of an insured, and that WIGA coverage is excess as to that coverage:

(1) Any person having a claim against his insurer under any provision in his insurance policy which is also a covered claim shall be required to exhaust first his right under such policy. Any amount payable on a covered claim under this chapter shall be reduced by the amount of such recovery under the claimant's insurance policy.

In opposition, Defendant GNIC argues that the WIGA fund is "other underlying insurance" collectible by the insured, that WIGA is an underlying insurer that steps into the position of the insolvent insurer and is obligated to defend the insured.

GNIC also argues that the policy language is not ambiguous and does not require GNIC to "drop down" and become the primary insurer. GNIC makes a grammatical argument that the comma and the "and" in the phrase ", and any other underlying insurance collectible by the insured" creates two tiers of primary coverage, the first of which is not limited by the collectibility language of the second.

Both WIGA and GNIC cite cases from other jurisdictions in support of their arguments. There is no Washington case law on the precise issue presented in this case, there is a dearth of case law on the WIGA Act generally, and the cases in other districts are split, with some having important factual differences.

Having considered the GNIC policy as a whole with specific reference to the language argued by the parties, the relevant provisions of the WIGA Act, and the rationale in the cases cited by the parties, the Court concludes that Summary Judgment of Dismissal must be granted to Defendant GNIC based on the following analysis.

*Analysis*

I. First, it is important to consider the nature and purpose of umbrella or excess insurance coverage and guaranty funds. In its discussion of the problem of overlapping or duplicate insurance, with suggested solutions to the problem, Appleman's *Insurance Law and Practice* discusses "excess insurance." The discussion considers policies that contain "excess" clauses that describe conditions under which the insurance in the policy will become excess rather than primary coverage. (Examples, concerning use of substitute vehicles or uninsured motorist coverage.) Appleman then explains:

> There is, however, a unique form of excess contract which always remains excess over and above all other applicable forms of contract, except as to the specific risks upon which it may elect to carry the primary burden. That is the umbrella or catastrophe policy. [Footnote omitted.] This is a needed form of coverage which picks up, above the limits of all other contracts, such as automobile and homeowners coverages, to give the security and peace of mind so necessary today where jury verdicts, or court awards, may be very substantial, to discharge the unexpected, but potentially bankrupting, judgment. The premium is comparatively small, for the size of the risk, so that the company cannot be expected to prorate with other excess coverages; and public policy should not demand that this be done.

Appleman, *Insurance Law and Practice* § 4906, p. 348. The discussion in Appleman at Section 4909.85 again summarizes the nature of "excess"—umbrella or catastrophe—coverage but focuses on "those areas where there is other insurance upon the risk with the question presented as to where the loss shall fall, and with the question of sharing, if any, of the consequences." § 4909.85, p. 453. This section notes that umbrella coverage

> involves no attempt upon the part of a primary insurer to limit a portion of its risk by describing it as "excess", nor the employment of devices to escape responsibility. Therefore, umbrella coverages, almost without dispute, are regarded as true excess over and above any type of primary coverage, excess provisions arising in regular policies in any manner, or escape clauses.

*Id.* at 453–54; footnote indications omitted.

The policy provided by Defendant GNIC appears unquestionably to be a genuine umbrella or excess coverage policy. First, it is denominated on its face to be an "Umbrella Liability Policy." (Exhibit B, GNIC policy, p. 1.) Second, it lists a "Schedule of Underlying Insurance" (hereafter "scheduled insurance"). Third, the policy provides for liability for "the ultimate net loss in excess of the applicable limits of underlying insurance as stated in Item 5 of the Declarations, and any other insurance collectible by the insured." (Part V of the GNIC policy.) Fourth, Section VII, "Conditions," Paragraph 6, "Other Insurance," states:

> The insurance afforded under this policy shall apply as excess insurance, not contributory, to other collectible insurance

... available to the insured and covering loss against which insurance is afforded hereunder.

Fifth, Paragraph 10 of Section VII, "Maintenance of Underlying Policies," states in greater part:

The Named Insured shall maintain the underlying policies (and renewals or replacements thereof) with limits of liability as stated in Schedule A in full effect during this policy period, except for any reduction or exhaustion of the aggregate limit or limits contained in such policies solely by payment of claims arising out of occurrences which happen during the policy period of this umbrella policy. Failure of the Named Insured to comply with the foregoing shall not invalidate this policy but in the event of such failure, GNIC shall be liable only to the extent that it would have been liable had the Named Insured complied therewith.

The GNIC policy is not a policy having a clause that declares conditions under which the stated coverage will be excess rather than primary. The entire policy is one in which the coverage is described as being in excess of other coverage. Thus, the GNIC policy is a true umbrella policy providing coverage in excess of any underlying insurance; it is not a policy providing primary coverage except under certain conditions where its coverage will be excess to other insurance.

II. Second, the nature and purpose of guaranty funds, such as that provided by WIGA, must be considered. WIGA provided coverage for the insured when the insolvent carrier could not.

Some general observations of guaranty funds may be made:

The intention of the legislature in establishing a State Insurance Guaranty Fund was to protect the public from losses arising from insolvency of insurers doing business in the state. Thus, such a statute may limit insolvent insurers to those authorized to do business in the state. But in creating a property and liability insurance security fund, the intent of the legislature was to extend protection against the insolvency loss to all holders of property risk policies regardless of the type of company that wrote the insurance.

It has been said that a State Insurance Guaranty Fund is not a collateral or independent source of recovery; rather, it is a substitution when expected coverage ceases to exist. One purpose of the Insurance Guaranty Fund Act was to place the claimants in the same position that they have been in if the liability insurer had not become insolvent. The dominant purpose of an Insurance Guaranty Association Act is to avoid delay and to settle as soon as possible claims of insolvent insurers which are ripe for payment.

Appleman, *Insurance Law and Practice* § 10801, p. 367; footnote indications omitted. Guaranty funds may also act aggressively to prevent insolvency from occurring. *Id.* at 366.

The purpose of the Washington Insurance Guaranty Association Act is set forth at the beginning of this order (pp. 1160–62), and it comports with the above general observations.

Among the powers and duties of the Association is the provision:

(1) The association shall: ...

(b) Be deemed the insurer to the extent of its obligation on the covered claims and to such extent shall have all rights, duties, and obligations of the insolvent insurer as if the insurer had not become insolvent.

RCW 48.32.060. Thus, WIGA steps in when there is a claim against a policyholder of an insolvent insurance company. WIGA acts as the insolvent insurance company would have acted absent the insolvency up to the face amount on the policy, but not more than $300,000. *Id.* (1)(a).

III. Third, the meaning of the GNIC policy language must be considered. The limits of liability language is clear and unambiguous. It says:

GNIC shall only be liable for the ultimate net loss in excess of the

(a) applicable limits of underlying insurance as stated in Item 5 of the

Declarations, and any other underlying insurance collectible by the insured.

If meaning is given to the word "other," then the phrase "collectible by the insured" must modify both scheduled insurance and insurance that does not appear on the schedule. To argue that the comma before the conjunction "and" creates two tiers of primary coverage, the first of which is not limited by the collectibility language of the second, is to ascribe more meaning than that comma may rightfully carry. It is, in fact, a comma that should not be there unless another comma were added to set off the phrase, "as stated in Item 5 of the Declarations." While a comma is appropriate before a conjunction introducing an independent clause, Strunk and White, *The Elements of Style*, I.4., the phrase "any other underlying insurance collectible by the insured" is not an independent clause as it does not contain a subject and a verb and could not stand alone as a complete sentence.

The question then becomes what "collectible" means in the context of the Limits of Liability provision. Does it mean that funds must actually be paid or does it serve as a referrent for establishing a threshold above which the umbrella coverage begins. If "collectible" meant funds actually paid, there would not be the certainty of knowing precisely where umbrella coverage would begin; such would not be the most practical or clear manner of providing umbrella insurance at a certain level. Moreover, the whole import of the Limits of Liability section is to set a threshold for umbrella coverage to begin with reference to the scheduled insurance and any other insurance that is not scheduled.

A similar analysis and conclusion is found in a unanimous Ohio Court of Appeals opinion involving the Ohio Insurance Guaranty Association (OIGA), an insolvent primary carrier, and an excess liability insurer. The OIGA argued that the excess liability insurer should "drop down" and assume liability for the insolvent company. The policy language in question read, "Other insurance—The insurance afforded by this policy shall be excess insurance over any other valid and collectible insur-

ance...." As the Court read this language,

"collectible" does not refer to the actual payment of a sum of money, but instead refers to the existence of other applicable insurance coverage based on the particular occurrence in question. Whether payment of other applicable and available insurance (be it primary, contributing, excess or contingent) actually takes place is not the focus of inquiry under the paragraph in question. Instead, the focus is on the existence of such applicable and available insurance. [Citations omitted.]

Whatever confusion the use of the word "collectible" in paragraph 8 creates, it cannot overcome the paragraph's attendant declaration that it is "excess" liability coverage for amounts "over," *i.e.*, above, beyond, greater than, or exceeding, any other available and applicable insurance.... We see no ambiguity when this condition is read in its entirety and in concert with other paragraphs of this policy's "Conditions" section.

*Wurth v. Ideal Mutual Ins. Co.*, 34 Ohio App.3d 325, 518 N.E.2d 607, 612 (1987). Similarly, when GNIC's policy is considered in its entirety as in Part I of the analysis herein, the theme of the policy as excess, over and above other insurance, mandates that "collectible" refers merely to the existence of other applicable insurance forming a threshold for the beginning of GNIC's coverage.

Plaintiff, however, argues that Part II "Defense and Supplementary Payments" (quoted p. 1161) requires GNIC to assume the defense of the insured in the place of the insolvent insurer.

Part II of the policy gives GNIC the right and duty to defend when there is no underlying insurer to do so. The question is whether WIGA is an "underlying insurer." In view of RCW 48.32.060 stating that WIGA shall

[b]e deemed the insurer to the extent of its obligation on the covered claims and to such extent shall have all rights, duties, and obligations of the insolvent

insurer as if the insurer had not become insolvent,

WIGA must be considered an underlying insurer. WIGA was created specifically to fill the void when an insurer becomes insolvent. Member companies contribute to the Association's fund according to a formula. GNIC, on the other hand, did not contract to insure the policyholder against the failure of the primary insurer. The policy contemplates that other primary insurance may be available to the insured other than that listed in the policy schedule. Other insurance has been made available to the insured by WIGA under the precise circumstances for which WIGA was created. It would be unfair to shift the burden to GNIC, for it did not contract to insure the risk of a primary insurer's insolvency, whereas WIGA was specifically created to prevent or insure against such risks.

Furthermore, if there were no association like WIGA to assume the duties and obligations of the insolvent insurer, GNIC would naturally want to be able to defend the insured, because it would be in its interest to prevent a default or to defend the case to its satisfaction.

Both the language of the GNIC contract and its entire theme as well as the statutory mission of WIGA mandate the conclusion that GNIC is not required to "drop down" and take up the burden of being the primary insurer in the place of the insolvent insurer. The Court in *Wurth* came to a similar conclusion, and its analysis is persuasive. *Wurth* has already been quoted concerning the language of the Excess Liability Policy. The following quotes *Wurth* on the public policy argument:

> That one insurance provider affords an insured excess liability insurance over and above the policy limits of a named or unnamed primary or underlying insurer should not, and does not, in and of itself, also impose upon that excess provider the risk of an underlying provider's insolvency. To so hold would effectively impose on excess coverage providers the burden of scrutinizing the financial stability of every other primary provider, [citations omitted] and place the risk of loss for securing an insolvent insurer not on the insurance purchaser, who purchased the policy, but on the excess coverage provider, who never contracted to cover such a contingency. To this court, such a state of affairs would constitute not only an unjust shifting of the risk of insolvency, but a rewriting of an excess insurer's general contractual undertaking simply to fulfill "notions of abstract justice." [Citations omitted.]

> It seems to us, by definition and long-standing principle, that an excess insurer is not generally liable for any part of the loss or damage which is covered by other insurance (be it collectible or uncollectible), but is liable only for the amount of loss or damage in excess of the coverage provided by all other applicable insurance policies. 16 Couch on Insurance 2d (1983) 484, Section 62:48. To adopt, due to public policy, a theory of "drop down" liability would fundamentally alter the risk an excess coverage provider is obligated to provide by agreeing to issue excess liability insurance protection.

518 N.E.2d at 610. The analysis in *Wurth* comports with the foregoing analysis in this case and allows both GNIC and WIGA to function as they intended: GNIC insures only in excess of $500,000 as it contracted and WIGA provides coverage not in excess of $300,000 in place of the insolvent insurer according to its statutory mandate.

NOW, THEREFORE, the Court concludes that the policy language in GNIC's excess umbrella policy is unambiguous and does not require GNIC's policy in this instance to "drop down" as primary coverage, and that neither the WIGA act nor public policy requires GNIC's policy to "drop down" as primary coverage; rather, the WIGA act and public policy require WIGA to step in as a primary carrier and provide a defense and primary coverage up to the limits allowed by RCW 48.32.-060(1)(a), thereby relieving GNIC, the excess carrier, of any duty to defend or to indemnify until or unless the damages or judgment exceed the limits of the primary policy of the insolvent carrier.

IT IS ORDERED that Defendant GNIC's Motion for Summary Judgment of Dismissal is GRANTED, there being no genuine issue of material fact and Defendant being entitled to judgment as a matter of law, and Plaintiff's Motion for Summary Judgment is DENIED.