CHASE RESORTS, INC., Appellant,

v.

SAFETY MUTUAL CASUALTY
CORP., Respondent.

No. 63058.

Missouri Court of Appeals,
Eastern District,
Division Three.

Nov. 23, 1993.

Motion for Rehearing and/or Transfer to
Supreme Court Denied Dec. 29, 1993.

Application to Transfer Denied
Feb. 22, 1994.

George L. Roberts, Jr., Robt. L. Devereaux, St. Louis, for appellant.

Russell F. Watters, Robt. Wm. Cockerham, St. Louis, for respondent.

SIMON, Presiding Judge.

Chase Resorts, Inc., appellant, appeals the granting of summary judgment in favor of respondent, Safety Mutual Casualty Corporation (Safety Mutual), appellant's excess insurer. Appellant filed a declaratory judgment action against Safety Mutual and the Missouri Property and Casualty Insurance Guaranty Association (MIGA) seeking: (1) a declaration of the rights and obligations of the parties under the MIGA Act §§ 375.771 to 375.779 R.S.Mo.Cum.Supp.1989 and the insurance policies of North West Insurance Company (North-West), appellant's underlying insurer, and Safety Mutual; (2) an order for either MIGA or Safety Mutual to pay

appellant's attorneys fees in the underlying litigation plus interest; and (3) the attorneys fees and costs of this action. On appeal, appellant contends that the trial court erred as a matter of law in granting summary judgment for the following reasons: (1) the language of Safety Mutual's excess insurance policy defining "Ultimate Net Loss" entitles appellant to be reimbursed for all its legal costs after the initial verdict; and (2) the underlying insurance was exhausted when the verdict of $700,000 was rendered, and thus, Safety Mutual had the duty and obligation to defend appellant.

We reverse and remand.

The following facts are stipulated by the parties and are not in dispute unless otherwise indicated. Appellant owns the Lodge of the Four Seasons located at the Lake of the Ozarks, which operated the Four Seasons Marina. On February 27, 1984, a boat dock at the Four Seasons Marina collapsed causing injuries to Mr. and Mrs. Kramer and Mr. and Mrs. Sebastian.

North–West issued its comprehensive general liability insurance policy providing appellant with insurance for liability for bodily injury and property damages up to a limit of $500,000. Safety Mutual issued its commercial umbrella liability insurance policy providing appellant with umbrella coverage for bodily injury, property damage, and advertising injury up to a limit of $5,000,000 in excess of the underlying coverage provided by North–West. On September 4, 1984, Mr. and Mrs. Kramer filed a negligence action in the Circuit Court of the City of St. Louis against appellant, and North–West provided the defense for appellant. However, during the pendency of the *Kramer* case, North–West was declared insolvent and could no longer provide the defense. After a brief time during which appellant paid for its own defense, MIGA, of which North–West was a member insurer, provided the defense for appellant pursuant to § 375.785.4(1)(b) R.S.Mo.Cum. Supp.1984 (Repealed L.1989 S.B. 333 § A).

Subsequently, the case was tried, and in January 1988, the initial verdict awarded Mrs. Kramer $600,000 on her claim for personal injuries, Mr. Kramer $50,000 on his claim for personal injuries, and $50,000 on his claim for loss of consortium. Appellant claims that after the verdict, MIGA offered to pay appellant only for the Kramers' special damages totalling $37,412.63, and that MIGA would not pay until appellant signed a policyholder's release. MIGA had no interest in appealing. Appellant claims it rejected MIGA's offer. After January, 1988, appellant paid for its own defense. Appellant settled the claims of the Sebastians for approximately $16,000 without a trial in the fall of 1988.

Appellant appealed the initial jury verdict. We reversed and remanded in *Kramer v. Chase Resorts, Inc.*, 777 S.W.2d 647 (Mo.App. 1989). We directed that the Kramers elect either a retrial where the damage award would remain unchanged but the jury would be instructed to determine after reconsideration of the evidence what percentage of fault, if any, is attributable to the Kramers, or a retrial on all issues. *Id.* at 653[10].

The Kramers elected to retry the case to determine their percentage of fault, if any. After the retrial in December 1989, the jury found no fault attributable to the Kramers so that the prior judgment was unchanged. In March 1990, the Kramers' judgment was satisfied upon the payment of $484,000 by appellant and $166,000 by Safety Mutual, for a total of $650,000. The payment of $484,000 by appellant represented the $500,000 retained limit under the North–West policy reduced by the $16,000 Sebastian settlement payment.

In its declaratory judgment action against MIGA and Safety Mutual, appellant seeks: payment of $132,508.55 for its attorney fees incurred in defending the Kramers' action from January 1988 to March 1990 plus interest; MIGA to pay appellant $37,412.63 for the Kramers' special damages plus interest; and Safety Mutual and MIGA to pay reasonable attorney fees and the costs of this litigation. In July 1991, MIGA settled with appellant for $125,000. On July 13, 1992, appellant and Safety Mutual filed their Stipulation of Uncontested Facts. On August 10, 1992, Safety Mutual filed its motion for summary judgment essentially contending that MIGA was responsible for the defense in *Kramer*

and that the underlying insurance was never exhausted.

On August 12, 1992, appellant filed its motion for summary judgment seeking that Safety Mutual be required to pay appellant $75,553.52 plus interest for appellant's remaining legal fees from *Kramer*. Appellant attached to its motion for summary judgment the affidavit of its Chief Financial Officer to prove that it incurred $75,553.52 in legal fees. The affidavit states that the MIGA settlement of $125,000 reimbursed appellant for the payment of $37,512.63 in special damages to the Kramers, and thus, the net settlement was for $87,487.37. We note that the $37,-512.63 in special damages differs from the $37,412.63 in special damages appellant demanded from MIGA in its motion for declaratory judgment. The affidavit further asserts that the ultimate net loss is total legal fees of $156,802.53, minus the net settlement of $87,487.37, for a total of $69,315.16. The affidavit arrives at the figure of $75,553.52 by adding interest accrued from July 1991 to July 1992.

On October 20, 1992, the trial court denied appellant's motion for summary judgment but granted Safety Mutual's motion for summary judgment.

■ The granting of a motion for summary judgment purports to dispose all issues, and therefore, is a final appealable judgment. *Kaufman v. Bormaster*, 599 S.W.2d 35, 37[1–3] (Mo.App.1980). Appellate review of a summary judgment is guided by Rule 74.04 of the Missouri Rules of Civil Procedure, which provides in pertinent part:

(c) ... [summary] judgment shall be entered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.

Thus, review of a summary judgment is a two-step process; first, a determination that there was no genuine issue of material fact requiring trial; second, that the judgment is correct as a matter of law. *State of Missouri, ex rel. James C. Kirkpatrick v. The Board of Election Commissioners of St. Louis County*, 686 S.W.2d 888, 892[2] (Mo. App.1985). Further, a review of a grant of summary judgment is equivalent to the review of a court-tried case, and if, as a matter of law, the judgment is sustainable on any theory, it must be affirmed. *McCready v. Southard*, 671 S.W.2d 385, 387[1] (Mo.App. 1984). We review the record on summary judgment in the light most favorable to the party against whom summary judgment was rendered. *Y.G. v. Jewish Hospital of St. Louis*, 795 S.W.2d 488, 494[9] (Mo.App.1990).

■ For the sake of a logical presentation, we will address appellant's second point first. Appellant contends the trial court erred as a matter of law in that Safety Mutual became obligated to defend appellant in January, 1988 when either North–West's policy coverage of $500,000 was exhausted upon the entry of the $700,000 judgment, or when MIGA tendered the $37,512.63 which MIGA contended was the extent of its responsibility pursuant to Missouri's Guaranty Act. Safety Mutual's policy provides:

### INSURING AGREEMENT

\* \* \* \* \* \*

.... [Safety Mutual] will pay on behalf of the insured for ultimate net loss in excess of the retained limit hereinafter stated which the insured shall become legally obligated because of

A. personal injury or

B. property damage or

C. advertising injury

to which this insurance applies, caused by an occurrence, and

1. With respect to any personal injury, property damage or advertising injury not within terms of the coverage of underlying insurance but within the terms of coverage of this insurance; or

2. If the limits of liability of the underlying insurance are exhausted because of personal injury, property damage or advertising injury during the period of this policy,

.... [Safety Mutual] will

a) have the right and duty to defend any suit against the insured seeking damages on account of such personal injury, property damage or advertising injury, even if any of the allegations of the suit are groundless, false or fraudulent, and make such investigation and settlement of any claim or suit as it deems expedient; but [Safety Mutual] shall not be obligated to pay any claim or judgment or to defend any suit after [Safety Mutual's] limit of liability has been exhausted by payment of judgments or settlements;

Appellant argues that because Safety Mutual's policy does not define the term "exhaustion," the policy is ambiguous. (Although appellant uses the term "exhaustion," Safety Mutual's policy uses the term "exhausted.") Appellant correctly notes that in Missouri, ambiguities in insurance contracts should be read in favor of the insured. *Williams v. North River Insurance Co.*, 579 S.W.2d 410, 412[1–4] (Mo.App.1979). Appellant cites *Federal Insurance Co. v. Scarsella Brothers, Inc.*, 931 F.2d 599 (9th Cir.1991) in support. In *Federal*, the court addressed whether the term "exhausted" as used in the "insuring clause" of an excess insurance policy included the insolvency of the underlying insurer. *Id.* at 604[6]. The "insuring clause" provided that:

In consideration of the payment of the required premium and subject to all terms of this policy, the Company agrees to pay on behalf of the insured LOSS resulting for any occurrence insured by the terms and provisions of the First UNDERLYING INSURANCE policy. . . . The insurance afforded by this policy shall apply only in excess of and after all underlying insurance has been *exhausted.*

(emphasis original) *Id.* at 603. The excess insurer argued that when the "insuring clause" and "maintenance clause" are read together, the term "exhausted" is defined. *Id.* at 603[5], 604[6]. The "maintenance clause" stated that the insured agreed to maintain the underlying insurance policy except for "any reduction of the aggregate limit . . . *soley by payment of claims* . . . ." (emphasis original) *Id.* at 603. The court rejected the insurer's argument, reasoning that the

"maintenance clause" defined a duty of the insured and not the insurer. *Id.* at 604[6]. The court found that because the term "exhausted" reasonably may or may not include the insolvency, the term is ambiguous, and the court then construed the ambiguity in the insured's favor. *Id.*

Likewise, appellant claims that Safety Mutual's use of "exhausted" is also ambiguous because "exhausted" is not defined in the "Definitions" section of the Safety Mutual's policy. Appellant asserts that a reasonable construction of Safety Mutual's policy would be that Safety Mutual had the duty to defend if the damages or judgment exceeded the limits of North–West's policy. Appellant cites *Washington Insurance Guaranty Association v. Guaranty National Insurance Co.*, 685 F.Supp. 1160 (W.D.Wash.1988) in support. In *Washington*, the court addressed the issue of whether an excess insurer had the duty to provide a defense for an insured when the underlying insurer became insolvent. *Id.* at 1162–1166. The excess policy provided:

With respect to such insurance as is afforded by this policy, if there is no underlying insurer obligated to do so, [the excess insurer] shall have the right and duty to defend any suit against the insured seeking damages on account of personal injury, property damage or advertising liability. . . .

*Id.* at 1161. The court held that the policy was unambiguous and that it provided excess coverage for any underlying insurance including insurance provided by a carrier which had become insolvent. *Id.* at 1163, 1165. The court then ruled that the excess insurer had the duty to defend insured if the damages or judgment exceeded the limits of the underlying policy of the insolvent carrier. *Id.* at 1165. Appellant argues that Safety Mutual had the same duty as the excess insurer in *Washington* because Safety Mutual's policy is similar to the policy in *Washington*.

Safety Mutual claims *Federal* is distinguishable because while Safety Mutual's policy provides that the underlying liability limits become exhausted due to personal injury, property damage or advertising injury, the

policy in *Federal* does not limit or describe "exhausted" at all.

The interpretation of the meaning of an insurance policy is a question of law. *Krombach v. Mayflower Insurance Co., Ltd.,* 785 S.W.2d 728, 731[1] (Mo.App.1990). In approaching the resolution of this appeal, we are mindful that the function of this court is to interpret and enforce an insurance policy as written; not to rewrite the contract. *Id.* In construing an insurance policy, the words must be given their plain meaning, consistent with the reasonable expectations, objectives, and intent of the parties. *Id.* The language of an insurance policy is ambiguous when it is reasonably and fairly open to different constructions. *Id.* at [2]. Ambiguity arises when there is duplicity, indistinctness, or uncertainty of meaning. *Id.* In interpreting whether the language used in the policy is ambiguous, the words will be tested in light of the meaning which would normally be understood by the average layperson, the layperson's definition will be applied unless it plainly appears that the technical meaning is intended. *Id.* Further, an ambiguous phrase is not considered in isolation, but by reading the policy as a whole with reference to the associated words. *U.S. Fire Insurance Co. v. Coleman,* 754 S.W.2d 941, 944[1] (Mo.App.1988). If the language of the policy is in fact ambiguous, the interpretation which is most favorable to the insured must be adopted. *Id.* In addition, exceptions and limitations contained in insurance policies should be strictly construed against the insurer. *Duncan v. Ray,* 768 S.W.2d 667, 669 (Mo.App.1989). Finally, although an insurer's duty to defend is broader than the duty to indemnify, all provisions of an insurance policy must be given effect and the policy must be reasonably construed in light of the specific situation with which the parties are dealing. *Id.* at 945[2].

Safety Mutual's policy provides that Safety Mutual will have the duty to defend appellant if the limits of liability of the underlying insurance are exhausted because of personal injury, property damage, or advertising injury during the period of the policy. Here, it is clear that a judgment for personal injuries was entered exceeding the underlying limits. It is undisputed that appellant had become obligated to defend itself because of the personal injuries sustained by the Kramers, the insolvency of North–West, and the refusal of MIGA to continue defending appellant. The issue becomes whether this sequence of events triggered Safety Mutual's duty to defend under its policy. When construing an insurance policy, we must give words their plain meaning, consistent with the reasonable expectations, objectives, and intent of the parties. *Krombach,* 785 S.W.2d at 731[1]. In so construing, we may consult standard dictionaries. *State v. Mummert,* 857 S.W.2d 869, 872[5] n. 1 (Mo.App.1993). We note that *Webster's Third New International Dictionary* (1976) defines "exhaust" as "to use up the whole supply or store of: expend or consume entirely . . . ." Here, the judgment for personal injuries clearly exceeded the limits of the underlying policy. The policy does not indicate what occurrence or occurrences stemming from personal injury, property damage, or advertising injury may exhaust the liability limits of the underlying insurance. The term "exhausted" reasonably may include entry of a judgment in excess of the underlying limits, especially when the underlying insurer is insolvent and the guaranty association refuses to continue the defense. Thus the policy is susceptible to different interpretations and is ambiguous. See *Krenski v. Aubuchon,* 841 S.W.2d 721, 729[22] (Mo.App.1992).

Our ruling is consistent with our decision in *U.S. Fire.* In *U.S. Fire,* we addressed the issue of whether the following excess insurance provision was ambiguous:

. . . . In the event of the reduction or exhaustion of the aggregate limits or liability of the underlying policies listed in Schedule A *by reason of losses paid thereunder,* this policy, subject to the above limitations, (1) in the event of reduction, shall pay the excess of the reduced underlying limits; or (2) in the event of exhaustion, shall continue in force as underlying insurance.

(emphasis original) *U.S. Fire,* 754 S.W.2d at 943[1]. This court found that the provision clearly stated that "exhaustion" could only occur by reason of losses paid thereunder

and not by the insolvency of the primary carrier. *Id.* at 944[1]. Unlike the excess carrier in *U.S. Fire,* Safety Mutual's policy does not define exhausted as occurring when the underlying insurer pays the losses in the underlying claim.

Our finding also comports with *Interco Inc. v. National Surety Corp.,* 900 F.2d 1264 (8th Cir.1990). In *Interco,* the excess policy provided:

> .... in the event of reduction or exhaustion of the applicable aggregate limit or ... limits of liability under said underlying policy or policies *solely by reason of losses paid thereunder* on account of occurrences during the policy period, this policy shall in the event of reduction, apply as excess of the reduced limit of liability thereunder.

(emphasis original) *Interco,* 900 F.2d at 1265. The court held that the clause clearly provides for drop down for exhaustion "solely by reason of losses paid" and not insolvency. *Id.* at 1268[6]. Unlike the excess insurer in *Interco,* Safety Mutual's policy does not provide for exhaustion when the underlying insurer pays the losses in the underlying action.

Also, in *Federal,* as in the instant case, the excess insurance policy did not expressly define "exhausted," and the language of the policy left the term susceptible to different interpretations. *Federal,* 931 F.2d at 603, 604[6].

However, we find that *Washington* is inapposite. In *Washington,* the parties did not dispute the meaning of the term "exhausted." *Washington,* 685 F.Supp. at 1161. Further, it is not clear from the opinion whether the excess policy used the term "exhausted." *Id.* In any event, the court found that the language of the excess policy was unambiguous, unlike Safety Mutual's policy. *Id.* at 1165.

Because of the ambiguity of Safety Mutual's policy, we must construe it in favor of the appellant. See *U.S. Fire,* 754 S.W.2d at 944[1]. Thus, we conclude that Safety Mutual had a duty to defend appellant when the jury verdict was rendered and judgment entered in excess of the coverage afforded by the underlying policy.

■ In its first point, appellant contends that the trial court erred as a matter of law because the language of Safety Mutual's excess insurance policy defining "Ultimate Net Loss" entitles appellant to be reimbursed for all its legal costs after the initial verdict. Safety Mutual's policy provides:

> "Ultimate Net Loss" means the total sum which the insured, or any company as his insurer, or both, become obligated to pay by reason of liability claims, either through adjudication or compromise, and shall also include ... law costs, premiums on attachment or appeal bonds, ... expenses for ... lawyers, ... and for litigation, settlement ... of claims and suits which, are paid as a consequence of any occurrence covered hereunder, excluding only the salaries of the insured's or of any underlying insurer's permanent employees.

Appellant argues that: (1) legal costs are specifically referred to in the definition; (2) the definition defines "Ultimate Net Loss" as the total sum which insured becomes obligated to pay by reason of liability claims; and (3) the compromise with MIGA is included in the definition because the definition specifically refers to settlements.

Safety Mutual contends that the references to legal costs in the definition for "Ultimate Net Loss" pertain only to the legal expenses incurred by the plaintiffs in the underlying claim (the Kramers), and not the insured (appellant).

Here, where the language is not ambiguous, we must employ its plain meaning. *Mummert,* 857 S.W.2d at 872[5]. We must also strictly construe exceptions and limitations against the insurer. *Duncan,* 768 S.W.2d at 669.

Safety Mutual's definition for "Ultimate Net Loss" provides that "Ultimate Net Loss" means the total sum insured becomes obligated to pay by reason of liability claims, including law costs, premiums on attachment or appeal bonds, and expenses for lawyers and for litigation. The definition does not limit the total sum of legal fees to the legal fees awarded in a judgment in the underlying suit or agreed upon in a settlement with the claimant. Moreover, Safety Mutual's definition also contains a clause providing that

*only* the salaries of the insured's or of any underlying insurer's permanent employees are excluded from "Ultimate Net Loss". If Safety Mutual had intended to exclude the costs of appellant's defense, it could have so provided in this or another exclusionary clause. Finally, the definition includes the settlement with MIGA because the definition specifically includes settlements. Again, if Safety Mutual had intended to exclude or limit settlements, it could have so provided. *Id.* Therefore, we hold that Safety Mutual has a duty to pay appellant's remaining legal fees for the underlying litigation.

In addition, appellant is apparently attempting to raise an additional point in its reply brief. Appellant essentially contends that the trial court erred in denying its motion for summary judgment because the North–West policy and MIGA's statutory obligation were both exhausted when the judgment in excess of the North–West's limits was entered and MIGA tendered the special damages of $37,412.63. Appellant argues that when the court denied its motion for summary judgment, the court denied its petition. Appellant asserts that in declaratory judgment actions, the denial of a summary judgment motion is an appealable order. Appellant maintains that the proper standard for review is that this court will not sustain the judgment unless there is no substantial evidence to support it, unless it is against the weight of evidence, or unless it erroneously declares or applies the law. Appellant cites *Harold S. Schwartz & Associates, Inc. v. Continental Casualty Co.*, 705 S.W.2d 494 (Mo.App.1985) in support. Under this standard, appellant claims the trial court erred as a matter of law for the same reasons appellant sets forth in its second point.

Reply briefs are only for replying to arguments made by respondents in their briefs. Appellant cannot raise new points in its reply brief because Safety Mutual would be denied the opportunity to respond to appellant's arguments. *Kramer v. Mason*, 806 S.W.2d 131, 134[7] (Mo.App.1991).

Even assuming arguendo that we may address appellant's point, we note that generally the denial of a summary judgment

motion is not an appealable order. *Clooney v. Pre–Paid Legal Services, Inc.*, 830 S.W.2d 566, 568[3] (Mo.App.1992). Further, *Schwartz* is inapposite because in *Schwartz*, the court reviewed the granting of a declaratory judgment, and not the denial of summary judgment. *Schwartz*, 705 S.W.2d at 495, 497[1]. Thus appellant's argument has no merit.

Therefore, we reverse and remand for further proceedings in accordance with this opinion.

Judgment reversed and remanded.

STEPHAN and PUDLOWSKI, JJ., concur.