FIREMAN'S FUND INSURANCE
COMPANY Appellant,

v.

TIG INSURANCE COMPANY,
Respondent.

No. WD 56474.

Missouri Court of Appeals,
Western District.

Submitted Sept. 9, 1999.

Decided Feb. 15, 2000.

Motion for Rehearing and/or Transfer to
Supreme Court Denied March 28, 2000.

Leonard B. Rose, Kansas City, for Appellant.

Douglas R. Richmond, Kansas City, for Respondent.

Before ALBERT RIEDERER, P.J.,[1] JAMES M. SMART, Jr. and JOSEPH M. ELLIS, JJ.

JAMES M. SMART, Jr., Judge.

This case involves questions relating to the allocation of responsibility for defense costs as between a primary insurer and an excess insurer when a claim is settled for an amount exceeding the liability limit of the primary insurer.

In 1995, Ferrellgas, a propane gas producer and distributor, contacted Lockton Insurance Company to arrange for Lockton to procure general commercial liability insurance for Ferrellgas for the period of August 1995 through August 1996. Ferrellgas instructed Lockton that it desired to be essentially self-insured as its own primary insurer for the first three million dollars of any liability. Ferrellgas also indicated that it wished to obtain an excess insurance policy which would provide excess coverage up to twenty-five million dollars. Accordingly, Lockton obtained an insurance policy from Reliance Insurance Company under which Ferrellgas would be liable for the first three million dollars of any claim by means of a deductible equal to the limit of coverage. It is not entirely clear whether defense costs were within or without the three million dollar limit, and it is further not clear whether Ferrellgas was required to promptly reimburse Reliance for defense costs. Ferrellgas paid a premium of $95,000 to Reliance for this policy, which Lockton referred to as "fronting" policy. Lockton then obtained an insurance policy from TIG Insurance Company providing twenty-five million dollars of coverage as to any liability incurred by Ferrellgas in excess of the coverage provided under the Reliance policy. Ferrellgas paid a premium of $580,000 to TIG for the policy of excess insurance. The policy with TIG referred to a schedule of "underlying insurance" on which Ferrellgas listed the Reliance policy.

On August 12, 1995, shortly after the policies went into force, a propane gas explosion at a motel severely injured six people. Ferrellgas, the supplier of the propane gas to the motel, was named in a lawsuit brought by the injured parties. Ferrellgas and the plaintiffs eventually reached a settlement in the amount of eighteen million dollars. Ferrellgas paid three million dollars, its full deductible under the Reliance policy, to the claimants,

---

1. Judge Riederer resigned from the court after submission of this case and before handdown.

and TIG paid the remaining fifteen million dollars of the settlement.

In the process of defending the lawsuit, Ferrellgas incurred legal expenses of approximately $580,000. Ferrellgas made a demand on TIG to reimburse the attorneys' fee expenses. When TIG refused, Lockton's errors and omissions carrier, Fireman's Fund Insurance Company, reimbursed Ferrellgas for most of the defense costs in consideration of the assignment of Ferrellgas' claim against TIG to Fireman's Fund.[2] Fireman's Fund subsequently brought suit against TIG to recover the defense costs associated with the personal injury claims.

The parties stipulated the facts and filed cross-motions for summary judgment concluding that there were no issues of material fact in dispute, and that the case could be decided as a matter of law. Fireman's Fund argued that TIG was responsible for the defense costs because, Fireman's Fund argues, TIG's policy makes TIG responsible for the defense costs when there is no underlying insurance to pay the costs. TIG argued in its summary judgment motion that TIG was not responsible for the defense costs because Ferrellgas did have "underlying insurance" covering the occurrence in question. TIG argued that Reliance, as the primary insurer, was responsible for the defense costs.

The lower court granted summary judgment in favor of TIG on the ground that the Reliance policy constituted "underlying insurance" and because the language of the TIG policy provides that TIG is not responsible for defense costs except for defense costs incurred after exhaustion of the underlying insurance.

■ Because the issue of summary judgment is a question of law, our review is *de novo. ITT Commercial Finance Corp. v. Mid–America Marine Supply*

*Corp.,* 854 S.W.2d 371, 376 (Mo.1993). If the party to whom summary judgment was granted demonstrates that there are no genuine issues of material fact and that it is entitled to judgment as a matter of law, the lower court's ruling will be upheld. *Id.* at 380. If the trial court's ruling can be sustained under any theory, it must be affirmed. *Chase Resorts, Inc. v. Safety Mut. Cas. Corp.,* 869 S.W.2d 145, 148 (Mo. App.1993).

## Duty to Defend

■ We start with the proposition that an insurer's duty to defend can arise only out of an insurance contract. *Crown Center Redevelopment Corp. v. Occidental Fire & Cas. Co.,* 716 S.W.2d 348, 357 (Mo. App.1986). If there is no language requiring the insurer to defend, there is no duty to defend. *Id.* at 357 n. 6. The duty to defend is separate from the contractual obligation to indemnify. *Id.* at 365. Generally, an excess insurer is not obligated to contribute to defense costs, or undertake a defense, until primary liability limits are exhausted. 14 Couch on Insurance 2d, § 51:36, pp. 446–47.

The pertinent portions of the TIG policy in question state as follows:

I.C.1.a. With respect to any occurrence covered by underlying insurance we shall not be called upon to assume charge of the investigation, settlement or defense of any claim made or suit brought against you, but shall have the right and be given the opportunity of any such claims or suits relative to any occurrence which, in our opinion may create liability on the part of us under the terms of this policy.

I.C.1.b. With respect to any occurrence not covered by the underlying policies listed in the schedule of underlying insurance, or any other underlying insur-

---

2. Apparently, Ferrellgas and Reliance disagreed as to whether Reliance had any responsibility beyond the three million dollar limit of liability for defense costs. Firemen's Fund, as errors and omissions insurer for Lockton, ended up paying the attorneys' fees and then taking an assignment from Ferrellgas as to any claims for reimbursement against TIG. Firemen's Fund stands in the shoes of Ferrellgas as to the claim for reimbursement.

ance collectible by you, but covered by the terms and conditions of this policy, we shall defend any suit against you seeking damages on account of bodily injury, property damage, personal injury, advertising injury even if any of the allegations of the suit are groundless, false or fraudulent; and may make such investigation and settlement of any claim or suit.

I.C.1.c. If the aggregate limits of liability under said underlying insurance are reduced or exhausted by payment of judgments, settlements or defense costs, that would be payable under the terms of this policy, then this insurance shall:

in the event of reduction, pay the excess of the reduced underlying limit; in the event of exhaustion continue in force as underlying insurance, but in such instances we shall defend only those suits brought within the coverage territory seeking damages payable under this policy and we may make such investigation and settlement of any claim or suit which does not exceed the aggregate limit of this policy.

### The Self–Insurance Issue

■ Fireman's Fund argues that Ferrellgas was self-insured as opposed to being covered by any underlying insurance. Because the policy's deductible amount was identical to the amount of coverage and because, according to Firemen's Fund, it was Ferrellgas' intention that it be self-insured, it asserts that the policy of insurance with Reliance did not amount to insurance but was actually self-insurance. Fireman's Fund argues, therefore, that the provision of TIG's policy which provides that TIG will defend in those situation where there is no underlying insurance requires TIG to pay the cost of defense in this instance.

Fireman's Fund relies upon *American Family Mut. Ins. Co. v. Missouri Power & Light Co.*, 517 S.W.2d 110 (Mo. banc 1975). In that case, Missouri Power &

Light had a plan of self-insurance for its automobile liability pursuant to a statute allowing such an arrangement where the insured is able to provide proof of financial responsibility. *Id.* at 111. The court in that case found that Missouri Power and Light's self-insurance did not constitute "other insurance" and held that it was not responsible for any of the amount paid by American Family in settlement of the claim. *Id.* at 114.

Fireman's Fund also relies upon *St. John's Reg'l Health Ctr. v. American Cas. Co.*, 980 F.2d 1222 (8 th Cir.1992). In that case, the insured was also self-insured through a pooled liability fund. *Id.* at 1223. American Casualty claimed that its policy of insurance was actually excess insurance because of the language of the policy referring to "other insurance." *Id.* The court held that the pooled liability fund did not amount to "other insurance." *Id.* at 1227.

TIG argues, however, that both of these cases are distinguishable in that in these cases there was no "fronting policy" which was specifically identified as "underlying insurance" on a schedule attached to the applicable policy whereas in this case there was. TIG argues that because the insurance contract between TIG and Ferrellgas required Ferrellgas to maintain an underlying insurance policy, and because the Reliance policy was identified as that underlying insurance policy, the facts of this case are entirely distinguishable. TIG points out that Ferrellgas paid $95,000 in premiums to Reliance for this coverage, and that a document entitled an "insurance contract" and placing certain responsibilities on Reliance, was issued. Moreover, Reliance did have exposure under that policy to advance to claimants amounts determined to be owing, subject to its right of prompt reimbursement from Ferrellgas. We note also that Ferrellgas did not intend to pay all costs of defense itself (as evidenced by the fact that Ferrellgas pursued a claim against the broker related to the confusion about the responsibility for

defense costs). We agree with TIG's argument that there was in fact underlying insurance. We conclude that the trial court did not err in considering TIG's policy as excess to the Reliance policy.

### Estoppel

■ Fireman's Fund argues that, in any event, TIG should be estopped from arguing that the Reliance policy was an underlying insurance policy. The reason, according to Fireman's Fund, is that TIG was well aware from the beginning, and its representatives so testified in depositions, that it knew the Reliance policy was merely a "fronting policy" so that Ferrellgas could be self-insured for the first three million dollars of coverage. We fail to see that such fact makes any difference. It may have been a "fronting policy," but it was still a policy of insurance, placing contractual obligations on Reliance. The elements of equitable estoppel include "an action taken by a second party on the faith of [an] admission, statement or act [by the first party]" and reliance on the part of the second party. *Blake v. Irwin,* 913 S.W.2d 923, 934 (Mo.App.1996). "The doctrine of equitable estoppel seeks to foreclose one from denying his own expressed or implied admissions which have in good faith and in pursuance of its purpose been accepted and relied upon by another." *Pinnell v. Jacobs,* 873 S.W.2d 925, 927 (Mo.App.1994) (quoting *Lake St. Louis Community Assoc. v. Ravenwood Properties, Ltd.,* 746 S.W.2d 642, 646 (Mo.App. 1988)). Fireman's Fund fails to demonstrate that TIG ever acknowledged that it would not treat the Reliance policy as primary insurance, or that Ferrellgas relied upon any such acknowledgement by TIG. Accordingly, we conclude TIG is not estopped from asserting that the Reliance policy was an underlying insurance policy. Because the Reliance policy was in fact a policy of insurance, we conclude that TIG is not, under provision I.C.1.b., responsible for all the attorneys' fees.

### Pro Rata Contribution

■ We turn next to the issue of whether, independent of I.C.1.b., TIG is responsible for any of the fees on a pro rata basis related to the respective amounts of claims paid. We review the applicable policy provisions in context. Provision I.C.1.a. above indicates that TIG is not responsible for the defense of a claim if the occurrence in question is covered by the underlying insurance. If the claim is of such size that TIG believes that it may be subject to liability under the policy, TIG is *entitled* to participate in the defense, but is not *required* to do so. Provision I.C.1.b., as we have already noted, provides that TIG will provide a defense as to claims related to occurrences which are not covered by the underlying insurance.

TIG argues that if defense costs are not payable under I.C.1.a. or I.C.1.b., then they are not payable under I.C.1.c. either because they would not satisfy the phrase "that would be payable under the terms of this policy." In other words, TIG seems to be arguing that because subprovision c requires payment of the cost of defense only to the extent required by a and b, there would never be any requirement to defend beyond that which is already required by subprovisions a and b. We disagree with this assertion. We believe it is more reasonable to conclude that the phrase "that would be payable under the terms of this policy" is a reference to the types of claims insured against. An insurance policy is to be construed so that all provisions of the policy have some effect. *Chase Resorts,* 869 S.W.2d at 150. We read subprovision c as providing in pertinent part that if, in the defense of various claims arising out of an occurrence, the aggregate limits of liability of the underlying insurance are exhausted by the payment of judgments, settlements, or defense costs, then TIG shall accept responsibility for the defense of the claims if the claims are of a kind which are within the coverage of the policy. In other words, once the liability of the primary carrier has been

exhausted, TIG will take responsibility for providing a defense. *See Hartford,* 861 F.2d at 1185.

### Exhaustion of Limits

██ In this case, the underlying limits were not exhausted until Ferrellgas paid three million dollars toward the settlement, which occurred simultaneously with the conclusion of the litigation. No demand was made on TIG to provide a defense thereafter because the matter was concluded. However, at some point a demand for reimbursement or contribution was lodged.

TIG disputes that the limits were exceeded because, TIG argues, the defense costs were outside of the specified limits of liability of the underlying policy. TIG's argument is based on the fact that, according to TIG, the terms of the underlying policy between the insured and Reliance were amended after the claims arose to provide that any defense costs would be within the three million dollar limits of Reliance's liability. TIG says that Reliance and Ferrellgas (and Fireman's Fund) are stuck with the specific language of the policy as it was in effect at the time TIG issued its excess policy. Fireman's Fund maintains that the amendment in question was effected only to clarify an ambiguity after TIG argued that the defense costs were outside the limits of the Reliance policy. TIG fails to show that it relied in any way on whether the underlying policy provided that costs of defense would be within or without the three million dollar limits. As far as we can tell, such policies as Reliance's are issued either with defense costs within or without coverage limits. While such policies might, more often than not, be issued with defense costs outside of liability limits, TIG fails to establish that it relied in any way on that expectation. Moreover, the policy terms as originally issued were not entirely clear. The amended policy was issued to clarify the original policy by conforming all parts of the policy to the original intent. Accord-

ingly, while it might be irregular to have an amendment of the underlying policy at a late date, especially an amendment which appears to work not only to the detriment of the insured, but also possibly to the detriment of the excess insurer, TIG does not allege that there is any fraudulent design in the amendment, or that it relied on the policy terms as originally issued. Therefore, we conclude that the amounts incurred for liability and for defense costs together exceeded the aggregate limits of liability by approximately $580,000.00.

This conclusion, in turn, raises another issue: whether, at the time of the settlement with the tort claimants, Ferrellgas had a duty to notify TIG that it would seek from TIG not only a fifteen million dollar settlement payment, but also would seek contribution for defense costs incurred to that date. The record does not indicate whether, at the time of the settlement with the tort claimants, the issue had surfaced concerning responsibility for the attorney's fees. It seems extremely unlikely that it had not surfaced. In any event, however, TIG does not claim that Ferrellgas waived the claim for reimbursement of attorney's fees by not asserting it earlier. Accordingly, we assume that Fireman's Fund is entitled to assert the issue at this time.

### Claim of Pro Rata Contribution

██ Fireman's Fund argues in its next "Point Relied On" that the trial court erred in failing to require TIG to pay a portion of the defense costs because "such a right of contribution has been recognized in similar circumstances in other jurisdictions where the primary insurer undertakes the defense and the claim exceeds the limits of the primary policy." At the outset, we must note that the Point Relied On does not assert a reason for reversing the trial court. The fact that the trial court may have reached a result which is not in line with rulings of some other states does not strongly suggest that the trial court erred. The appellant does not argue that the trial court failed to properly

236

construe the language of the policy. Instead, Fireman's Fund suggests that certain other jurisdictions have recognized the equity in a policy of pro-rata contribution.[3] Fireman's Fund argues that a pro rata right of contribution would be consistent with the reasonable expectations of the respective insurers, but does not argue that the language of the policy expresses an intention to provide for a right of contribution. The record, however, reveals no evidence, through testimony as to underwriting practices or otherwise, that insurers ordinarily understand the language in question as creating a right of contribution in such circumstances. Accordingly, we cannot say that Fireman's Fund has demonstrated that the trial court erred in its ruling.

The judgment of the trial court is affirmed.

JOSEPH M. ELLIS, Judge, concurs.

---

3. The parties point out leading cases from other jurisdictions on both sides of the issue as to whether the policy language and equitable principles support pro rata right of contri- bution. Some of the cases are also collected at Annotation, *Allocation of Defense Costs Between Primary and Excess Insurance Carriers,* 19 A.L.R. 4th 107 (1983).